## Evans Chemical Works v. Ball.

(Decided June 4, 1914.)

### Appeal from Boyle Circuit Court.

1. Master and Servant—Mining—Duty to Furnish Reasonably Safe Place.—It is the duty of a master who is engaged in mining barytes in a deep, open ditch, to exercise ordinary care to keep the ditch in a reasonably safe condition for the laborers to work in it, and if one of them is injured by a failure to perform this duty, he may recover damages for this breach.

2. Master and Servant—Liability of Foreman for Injury to Servant Under His Control.—Where a foreman has charge of a crew of men engaged in mining, and it is his duty to make, or have made, an inspection of the premises for the purpose of discovering whether the place is safe or dangerous, and he fails to perform this duty, and without having performed it, orders the men to go to work, he may be sued in damages by one of the men who. was injured by his failure to perform these duties.

3. Master and Servant—Assumption of Risk—Danger Created by Servant.—A servant assumes the ordinary risk of his employment, and where he creates the danger in the progress of the work, he must take care to protect himself; but he does not assume the risk caused by the failure of the master to furnish him a reasonably safe place in which to work.

4. Argument of Counsel—Improper Not Excusable on Ground that It Is in Reply to Other Argument—Exceptions.—When the argument of counsel complained of is made in answer to argument of opposing counsel, this circumstance may save it from the condemnation of such arguments, but an attorney will not be permitted to seize upon some remark made by opposing counsel as an excuse or justification for making improper argument.

JAY W. HARLAN, CHAS. H. RODES and NELSON D. RODES for appellants.

EMMET PURYEAR, JOHN W. RAWLINGS and ROBT. HARDING for appellee.

OPINION OF THE COURT BY JUDGE CARROLL—Affirming.

The appellee, Dank Ball, was employed as a laborer by the Evans Chemical Works, which was engaged in the mining of barytes in Boyle County. The mine, in which he was working at the time he received the injuries complained of, was an open ditch about 25 feet wide at the top of the ground, about 12 feet wide at the bottom, and of a depth varying between 15 and 25 feet. The sides of the ditch were composed of rock and dirt and sloped outward. The ditch was about 50 feet long and was in the form of steps ascending toward both ends from a point near the center at the bottom. These steps were called "benches" or "banks" and consisted of ore and dirt which was being excavated. Each bank or bench rose from 4 to 6 feet above the next lower bench or bank, and had a flat top several feet in width and length.

In mining the ore, dynamite would be placed in holes made in one of these benches and exploded, thus causing the ore and dirt in the bench to be torn up. After an explosion was made, the employes would return to the ditch and begin the work of digging the ore from the bench which had been torn up by the dynamite, and would pick and shovel the ore and dirt down to the bench on which they were standing or put it immediately into the hoisting boxes. The miners in thus working would stand on the bench just below the one that had been

torn up by the dynamite, and after they had shoveled the dirt and ore to the bench on which they were standing, or direct into the boxes, it would be hoisted to the top of the ditch, the dirt being put in one pile and the ore in another.

On the day Ball was injured, two blasts of dynamite were set off in a bench, and when the smoke had cleared away, the foreman, Jordon, and several laborers, including Ball, went down in the mine for the purpose of beginning work. While Ball was standing on a bench at the bottom of the mine shoveling dirt and ore from the bench that had been blown up with dynamite, and which was just above the one on which he was standing, a large lump of ore and dirt weighing probably 500 pounds, fell from the side of the ditch several feet above where he was standing and rolled against his leg, breaking it badly.

In this action to recover damages for the injuries thus sustained, the suit was brought against the Chemical Works and Jordon, the foreman in charge of the laborers, including Ball, and a judgment rendered against both of the defendants.

A reversal of the judgment is asked upon several grounds that will be noticed in the opinion, but the chief one is that the jury should have been directed to return a verdict for the defendants.

The case for the plaintiff was practiced upon the theory that the defendants owed him the duty of exercising ordinary care to furnish him a reasonably safe place in which to work, and that his injuries were caused by a failure upon their part to perform this duty; and upon the further ground that he was ordered by the foreman, Jordon, to go down in the mine and begin work at the time and place he did, when he did not know, but Jordon did know, or should have known, of the danger to which he would be exposed from large lumps of dirt and ore, that had been jarred loose by the dynamite, falling from the side of the ditch.

The theory of the defense was that the plaintiff had himself examined the banks and the place at which he was put to work, and that it was his duty to see that the place was reasonably safe before he commenced work, and if it was not, to take such precautions as might be necessary to make it reasonably safe. Another defense was that the work in which the plaintiff was engaged

caused the lump of dirt and ore to fall from the bench that had been torn up by the dynamite, and that the company did not owe him the duty of keeping a place safe that was being constantly made dangerous in the progress of the work in which he was engaged.

The appellee testified: "We had cleaned up the dirt that had fallen off of the bank, and I think had dug a little, too; I am not certain. I was down shoveling the dirt that I had dug off or had about cleaned up, and I had started over after a shovel of dirt, when the lump hit me right in the breast. Q. What happened when you started over after a shovel of dirt? A. Well, that dirt hit me. The dirt that had fell from the bank slipped out of the bank a little above my head; a great big lump of dirt hit me right in the breast, and it seemed like it ran right down me and shot that leg and broke it. Q. How big a plug of dirt was it that fell out of the bank? A. I suppose it weighed some five or six hundred pounds. Q. Did you know before it fell that it was in a position to fall? A. No, sir. Q. Was there anything about it that attracted your attention or that you saw that indicated to you that it was about to fall? A. No, sir. I was going down after a shovel of dirt; just shoveling dirt and putting it in the box, and as I went over after the dirt, it struck me. Q. Gave way and struck you? A. Yes, sir. Q. Where were those blasts put in by Jordon, the foreman, just before you went in down there? A. They were about five or six feet in front of me; they were above my head some. Q. Who set them off, do you know? A. I think Jim Jordon. Q. Then after that was done, what did Mr. Jordon order and direct you and the other hands to do? A. Well, we all sort of looked for the dynamite that had blowed off and shot off, and he just made a remark, 'We didn't blow much of it off, but we loosened it up so we can dig it easy,' or something of that kind." Q. What did he tell you to do? A. He told us all to go down in the mine, and led the way. Q. To do what? A. I went on at the same work I had been doing. Q. What did he tell you to go and do? A. Digging barytes. Q. And after he told you to go to work digging barytes, did you obey his orders to do that? A. Yes, sir; we obeyed his orders and went on to work. Q. How long after the blast was it that he gave you that order to go down there? A. I suppose ten or fifteen minutes. Q. Did

you know that it was unsafe for you to go down there into the mines? A. No, sir. Q. Did you know that it was dangerous for you to go down there and obey that order? A. No, sir. Q. At the time you were hurt, you were digging in that bench and digging barytes out of that bench? A. I had been. I was shoveling when I was hurt. Q. But prior to that you had been digging out of this bench? A. Yes, sir. Q. This lump of dirt that fell, fell out of this bench in front of you? A. No, sir; kind of in front of me, kind of on the side. Q. It was out of the bench, wasn't it? A. Yes, sir. Q. Did it fall out of the face of the bench? A. No, sir. Q. Where did it fall? A. Sort of on this side. Q. I will ask you what instructions you had from Mr. Jordon, the foreman, relative to digging this barytes, as to what your duties were? A. He told us to dig barytes. Q. I will ask you if he didn't tell you that it was a part of your duty, in digging barytes, to keep a lookout? And after a blast was shot, to go up and help clean off all the loose dirt and prize all the loose dirt down, so that it would not fall and it would be safe to work in the ditch? A. No, sir. Q. I will ask you if that wasn't a part of your duties to do it? A. He never had ordered me to do anything of that kind. Q. In digging into this bank and digging out this barytes, would you not loosen the other dirt which was around it? A. No, sir; we could not loosen it much on account of its being so tough and hard. Just what a fellow could dig out with his pick was about all he could get. That was the reason they put in the dynamite, to loosen it up so that it wouldn't be so tough and hard to dig.''

Jordon, the foreman, testified that when they came back to the ditch afer the dynamite had been exploded, he told Ball and Pollard and other workmen to prize all the loose stuff down where the shots were fired, for fear something might fall, and that they did so. ''Q. In what manner did they attempt to comply with this order, and how did they attempt to do it? A. Well, they taken some crowbars and was prizing off where the stuff was loose; where we saw a crack, prizing it off and throwing it overboard. Q. Did you see Mr. Pollard doing that? A. Yes, sir. Q. Did you see Mr. Ball working prior to the falling of the dirt in that ditch? A. Yes, sir. Q. What portion of the bench was he working on; was it anywhere close to the place where the dirt fell from? A.

Yes, sir. Q. Did you give Mr. Ball any instructions as to how he was to perform his duty digging barytes and what he was expected to do? A. Well, I gave them all their instruction. Q. Did you give him any? A. Well, I don't know as I gave him any. I gave general instructions to all of them that after a shot was fired if there was anything loose lying around anywhere that would probably fall and hurt them, to prize it off, and not go into anything that they thought was dangerous. Q. Did you know that this lump of dirt was hanging or loose? A. No, sir. Q. Had you been there to see what effect that dynamite had on these walls? A. Yes, sir; on top I had. Q. Well, down in that place there? A. No, sir; I don't know as I had. Q. Well, didn't you know what it would do? A. Yes, sir; I knowed what it would do. Q. And didn't you know what you put it in there to do? A. Certainly; I put it in there to loosen up the dirt. Q. Well, I am asking you, isn't it a fact that although you knew that bad conditions existed down there from those blasts, that you yourself didn't go down there to see and examine whether it was safe for those men to go down there? A. Not underneath where it fell; no, sir. Q. Then you ordered these men to go down into a place of that kind without going to see whether it was safe or not? A. No, sir; I ordered them to go down after they got the loose stuff punched down.''

This witness further said that he made no examination of the sides of the ditch at any place except by standing on top of the ground and making such an examination as could have been made from there, and that he did not discover from that point any signs of danger at the place where Ball was working. To make this clear, we quote further from the evidence of this witness:

''Q. Then after that blasting was in there, you didn't make any examination of any of the walls? A. Yes, sir; on top. Q. You examined the top? Where did you examine it? A. I examined at the top for cracks where the shot was put in. Q. What did you find? A. Found some cracks opened up. Q. And you knew where they would extend to? A. I knew the cracks were there. Q. And you expected these cracks to extend way down there to the bottom of the pit? A. Why, certainly; yes, sir. * * * I didn't see the piece underneath that fell on him. Q. You didn't look to see? A. No, sir; I didn't see it. Q. If your duty required you to keep that place

safe for these men to work in there, why couldn't you have gone there to see whether that was safe? A. Probably there would have been somebody else in the same condition; I had to look after them all. Q. Why didn't you look after the whole thing before you sent any of them in? A. I did see after it the best I knew. Q. It was your duty as foreman there to keep that place reasonably safe for those men to work? A. It was their duty to look out for themselves. Q. It was your duty, wasn't it, before sending those men down in there, to examine and see whether it was safe for them to go down there? A. Yes, sir; and I did. Q. You say you did do that? A. I had done it, as far as I knew. Q. And you made no examination, although it was your duty to see whether it was safe, except at the top? A. Except at the top where the crack was opened up and they got any to prize off. Q. And you knew if it was broken off at the top that it would go down to where those steps were? A. I didn't know it. Q. You put it in there to do it? A. I put it in there to do it; yes, sir.''

Without relating further of the evidence, it shows that Jordon, the foreman, and Ball, and perhaps some of the other men, before going down into the mine made some examination at the surface of the ground to see if there was any loose dirt or other substance at or near the surface that would likely fall into the mine, but that no examination or inspection of any kind was made to discover the condition of the sides of the walls at or near the place where Ball was working.

Under the facts as we have stated them, we think Jordon, the foreman, before sending the men down in the bottom of the mine to work, owed them the duty of making, or having made, some inspection or examination of the sides of the walls for the purpose of discovering, or attempting to discover, if the explosion had loosened any large lump that would be liable to fall and injure the laborers while at their work. But this he did not do, nor was the place reasonably safe, although it was the duty of the Chemical Works to have exercised ordinary care to make it so.

There is much dispute in the evidence as to whether it was practicable to box this mine or timber it so as to prevent the sides from falling in, but we think the fact that the mine was not timbered or boxed imposed upon the foreman the duty of exercising greater care to see if

there was any danger of the wall falling in, as he might reasonably have anticipated so close after the explosion that some parts of the walls of the mine would be loosened and shattered and likely to fall. The evidence shows that the purpose of putting dynamite in was to loosen up the dirt in the benches, and that the explosion had also the further effect of unsettling and disturbing the entire formation and condition of the sides, leaving them subject to cave in.

Upon the whole case, there was sufficient evidence to take the case to the jury upon the ground that the Chemical Works failed in the performance of its duty to exercise ordinary care to make the place reasonably safe, and that Jordon committed a breach of duty in ordering the men into the mine when and as he did. And there was not sufficient evidence to show that as a matter of law Ball was guilty of such contributory negligence as would defeat a recovery.

It is earnestly insisted that Ball assumed the risk incident to the work, and that the falling of lumps of clay like the one that struck him was one of the incidents of the work, and, therefore, the defendants should not be held liable for the injury he sustained.

There is a class of cases holding that where the danger is obvious, the laborer assumes the risk, and the employer will not be liable for injuries that happen to him; and it is also true that the laborer assumes the ordinary risk of the employment, but he does not assume risks that are created by the negligence of the master. Examples of this class of cases may be found in: Wilson v. Chess & Wymond Co., 117 Ky., 567; Clifton v. C. & O. Ry. Co., 31 Ky. L. R., 431; Burch v. Louisville Car Wheel Co., 146 Ky., 272; L. & N. R. R. Co. v. Boone, 138 Ky., 700; Dyer v. Pauley Jail Building Co., 144 Ky., 592; Warren v. Jenuesse, 122 S. W., 862; Fluehart Colleries Co. v. Elam, 151 Ky., 47.

There is another class of cases holding that where the laborer creates the danger in the progress of the work, he must take care to protect himself. Examples of this class of cases may be found in: Smith v. North Jellico Coal Co. 131 Ky., 196; Boyd v. Crescent Coal Co., 141 Ky., 787; Proctor Coal Co. v. Beaver, 151 Ky., 839; Wight v. Cumberland Telephone & Telegraph Co., 137 Ky., 299.

But the facts of this case do not bring it within the scope of the principle announced in these cases. The danger was not obvious, nor was it created by the work Ball was doing. The dangerous conditions were made by the explosion of the dynamite, and Ball, when injured, was only removing the dirt and ore that had been torn loose by the explosion.

It was of course his duty to exercise ordinary care to protect himself and to discover the danger, and both of these things there is evidence to show that he did. It was likewise the duty of the Chemical Works to exercise ordinary care to furnish him a reasonably safe place in which to work, and the duty of Jordon to have made an examination of the walls, and there is evidence tending to show that neither of them performed their respective duties.

It is further urged that the court should have removed the case against the Chemical Works, a foreign corporation, to the Federal court upon its motion made at the conclusion of the evidence for the plaintiff, upon the ground that there was no evidence even tending to fix liability for the accident upon Jordon, the resident defendant, and this being so, it is said the joinder was fraudulent. It is further urged that there was no evidence tending to show that Jordon was liable, and so the jury should have been directed to return a verdict in his favor.

Both of these contentions will be disposed of together, as they involve the single question whether there was evidence sufficient to authorize the joinder of Jordon as a defendant and the submission to the jury of the case against him. Formerly it was denied that a superior officer such as Jordon was, who in this capacity acted for the master in directing and controlling the conduct or movements of his subordinates, could be subjected to liability at the instance of a subordinate who had been injured by reason of his negligence whether called nonfeasance or misfeasance in failing to perform duties imposed upon him by virtue of his position, such as the duty of exercising ordinary care to protect the subordinate from danger or the duty of not ordering him into places of danger of which he was ignorant.

The more recent cases, however, have adopted a different view, and now it is the settled law of this State as declared by this court that a superior officer such as Jordon was is jointly and severally liable for a failure to

perform personal duties, whether of misfeasance or non-feasance which failure results in injury to one to whom the duty is owing. Thus in the case of Haynes' Admr. v. C., N. O. & T. P. Ry. Co., 145 Ky., 209, the railroad company and the engineer in charge of the engine were jointly sued by the administrator of the fireman, whose death was caused by the alleged negligence of both of them. In the course of the opinion in that case the court said:

"If the accident had been caused by either misfeasance or nonfeasance amounting to a breach of duty on the part of the engineer, we would hold him liable. In some jurisdictions the servant is not held accountable to third persons for nonfeasance, but is for misfeasance; but a contrary rule and one that is in accord with the weight of modern authority prevails in this State. We do not recognize any distinction so far as the accountability of the servant is concerned between acts of misfeasance and nonfeasance. Ward v. Pullman Co., 131 Ky., 142, 25 L. R. A. (n. s.), 343; C. & O. Ry. Co. v. Banks, 144 Ky., 137; Illinois Central R. R. Co. v. Coley, 121 Ky., 385, 1 L. R. A. (n. s.), 370. If a servant performs in an unlawful manner an act that results in injury to a third person, or if a servant fails to observe a duty that he owes to third persons, and injury results from his fault of commission or omission, he is liable in damages. There is no reason for making a distinction between acts of commission or omission when each involves a breach of duty. The servant is not personally liable in either case because the breach of duty was committed by him while acting in the capacity of servant, but responsibility attaches to him as an individual wrongdoer without respect to the position in which he acts or the relation he bears to some other person. It is the fact that the servant is guilty of a wrongful or negligent act amounting to a breach of duty that he owes to the injured person that makes him liable. It is not at all material whether his wrongful or negligent act is committed in an affirmative or wilful manner, or results from mere non-attention to a duty that he owes to third persons, and that it is entirely within his power to perform or omit to perform. There are innumerable situations and conditions presented in the every day affairs of life that make it the duty of persons to so act as not to harm others, and when any person, whatever his position or relation

in life may be, fails from negligence, inattention or wilfullness to perform the duty imposed, he will be liable."

In Murray and C. & G. Tel. Co. v. Cowherd, 148 Ky., 591, Murray and the Campbellsville & Greensburg Telephone Co., of which he was manager, were sued by Cowherd to recover damages for injuries sustained by him on account of a telephone pole falling on him. There was a judgment against both of the defendants, and a reversal was asked as to Murray upon the ground that as manager he was not liable for the failure to have the pole in proper condition. In answering this contention and holding that he was jointly liable with the company, we said:

"The reversal is urged in behalf of Murray. He takes the position that at the most his negligence was that of nonfeasance, the failure to inspect the pole properly, and that a servant is not liable for an injury resulting alone from his non-activity; that his duty was a duty which he owed alone to his employer, the telephone company, and that if he failed to perform this duty of inspection, he is answerable alone to the company, his superior and employer.

"The distinction sought to be drawn between a servant's acts of misfeasance and those of nonfeasance, resulting in an injury to another, with his consequent liability in one case and his non-liability in the other, does not obtain in Kentucky, when the negligence, whether of misfeasance or nonfeasance, involves some breach of the servant's duty. * * * The defect could have been discovered by an inspection. It was the duty of Murray to inspect and maintain the line. He owed such travelers an affirmative duty in the exercise of reasonable care to inspect and maintain this pole in safety. For his negligent failure to discharge this duty, whether it be called misfeasance or nonfeasance, liability attaches to him in favor of one injured by it."

In the note to Ward v. Pullman Co., 25 L. R. A. (n. s.), 343, the editor has collected cases from other courts supporting the view expressed in these cases.

We think these cases are controlling authority in favor of the view that a superior servant acting in such a capacity as Jordon is liable for his personal negligence or personal failure of duty when this negligence or this failure to discharge a duty results in injury to a subordinate employe under his control or management. In this case Jordon could not of course be held liable for

the failure of the Chemical Works to furnish Ball a reasonably safe place in which to work, and we do not put his liability upon this ground. But there was evidence tending to show that it was his duty to inspect this ditch after an explosion for the purpose of discovering whether the laborers would be put in danger from falling material, and evidence conducing to show that he did not perform this affirmative, personal duty. There was also evidence to show that, without making this inspection, he ordered Ball and the other men to go to work in the ditch and that in obedience to his direction, Ball did commence work, and this, under the circumstances, was personal negligence for which he could be held liable.

Another ground of reversal relied on is the alleged improper argument of counsel for the plaintiff. It appears from the bill of exceptions that the argument of counsel complained of was made in answer to portions of the argument of counsel for the Chemical Works, and this circumstance, we think, saves it from the condemnation of such arguments expressed in the cases of L. & N. R. R. Co. v. Payne, 138 Ky., 274, and C., N. O. & T. P. Ry. Co. v. Martin, 154 Ky., 348.

We do not, however, wish to be understood as saying that an attorney may seize upon some remark made by opposing counsel as an excuse or justification for making an improper argument.

The argument objected to in this case comes dangerously near being a reversible error, and nothing saves it from such rebuke except the fact that it was said to have been made in answer to argument made by opposing counsel. If the argument to which it purported to be a reply were in the record, we would judge for ourselves whether it was a fitting response to it and determine the matter accordingly; but as the argument of the other counsel is not in the record, we must assume that the argument objected to was an appropriate reply to it, especially in view of the fact that the trial judge who heard both of the arguments declined to rule that it was objectionable.

The instructions given are complained of, but after carefully reading them, we think they submitted fairly the issues in the case to the jury. At any rate, we are well satisfied that the substantial rights of the defendants were not prejudiced by any verbal or technical errors in the instructions given or by the action of the

trial court in declining to submit any of the offered instructions.

Upon the whole case, we think the judgment should be affirmed, and it is so ordered.