# Walden v. Jones.

Jan. 13, 1942.

396

Hiram H. Owens and Curtis & Curtis for appellant.

A. E. Funk and Luker & Luker for appellee.

OPINION OF THE COURT BY VAN SANT, COMMISSIONER—Reversing.

This action was instituted by Gary Phillip Jones, an infant one year of age, by his next friend, Evy R. Jones, to recover damages for the loss of his eyesight allegedly caused by the negligence of the defendant, Dr. Harold L. Walden, in failing and refusing to place nitrate of silver in his eyes at the time of his birth.

The defendant's answer consisted solely of a general denial. At the close of the evidence for plaintiff and at the close of all the evidence, defendant's motion for a peremptory instruction was overruled to which rulings exceptions were saved. The jury returned a verdict in favor of the plaintiff awarding him damages in the sum of $5,000 upon which verdict the court entered the judgment appealed from.

The points made in support of the argument that a peremptory instruction should have been given are numerous but resolve themselves into two contentions: (1) negligence was not established; (2) it is not shown that the negligence was the proximate cause of the injuries. Proper consideration of these contentions requires a brief resumé of the facts as developed by the evidence.

It is admitted by the defendant that he was the physician in attendance at the birth and that he did not place silver nitrate or any other prophylactic in the eyes of the plaintiff, either at birth or at any time thereafter, although the mother of the child requested him to do so. Plaintiff was born about 5 o'clock A. M. and was the second child defendant had delivered that morning. Defendant testified that he had an old bottle of nitrate of silver which had been in his grip for some time, but

since it had crystallized, he was afraid to use it; that he discussed the matter very thoroughly with the mother and told her that due to the early hour of the morning the drug store was not open, and, if she had never been infected with gonorrhea, it was not imperative to use silver nitrate; but if she had ever had such disease he would be glad to write a prescription which they could have filled and use in the eyes of the child. He further testified that he returned to the house later that day and that he did not bring any silver nitrate with him. It was proven without contradiction that it is the recognized practice of the medical profession in communities and neighborhoods similar to that involved in this case to drop silver nitrate in the eyes of a child immediately after delivery. It was proven that, in accordance with Section 2062b-2, Carroll's Kentucky Statutes, 1936 Edition, the State Board of Health previous to the birth of plaintiff had adopted a regulation in the following language:

"It shall be the duty of the State Board of Health to secure the co-operation and assistance of the national health authorities in dealing with these diseases and to prepare and issue bulletins and other literature containing professional and popular information as to the prevalence and infectious character of such eye diseases, and the precautions to be used against such infections and to furnish formula and other information for the use of physicians and midwives in the management and treatment of such diseases. It shall be the duty of the County Board of Health to furnish to the physicians and midwives the simple drugs to be used for the indigent in preventing and in treating such diseases."

It was shown by the testimony of Dr. A. T. McCormack, Commissioner of Health of Kentucky, and another physician that proper care of a baby upon birth requires silver nitrate to be dropped in the eyes, and that, although a certain percentage of cases of opthalmia develop following the application, the percentage is small; and we infer from the medical testimony as a whole that those infections which develop following the application of silver nitrate do so because the medicine is unskillfully applied and does not actually touch the eyeball of the patient.

The law has been well determined in this and, we be-

lieve, all jurisdictions that a physician is liable for an injury to his patient resulting from want of required care or skill or from the omission to use reasonable care and diligence in the treatment of the patient. Stevenson v. Yates, 183 Ky. 196, 208 S. W. 820, 822, and cases and texts therein cited. This court is likewise committed to the rule that the standard of knowledge, skill, and required care which physicians must possess and exercise under the above rule of law is such reasonable and ordinary knowledge, skill, and diligence as physicians in similar neighborhoods and surroundings ordinarily use under like circumstances. Stevenson v. Yates, supra, and cited cases. Certainly the evidence that the defendant failed to place a prophylactic in the eyes of the new born child is sufficient to conclusively establish negligence on the part of the physician, in the light of the uncontradicted medical testimony that in all localities physicians ordinarily use silver nitrate or some other prophylactic in the eyes of a child at birth, and that reasonable care and diligence require such to be done. Defendant contends he was called on this case in an emergency, i. e. he was in attendance on another child birth when called to deliver the plaintiff, and therefore is not to be charged with the same degree of diligence as the physician in an ordinary case. There is no force to this argument. Plaintiff's family's physician was unable to attend the case because of absence from town and the day before plaintiff's birth defendant accepted the responsibility of the case. He must have known at that time that one of the births probably would follow closely on the other. With this imputed knowledge he should have equipped himself to properly care for the eyes of both children, but, disregarding his duty in that respect, he did not prepare for either. It is therefore unnecessary for us to determine whether a physician is charged with the same degree of care in an emergency as he is in the course of his regular practice, and we specifically refrain from doing so. We therefore conclude that defendant's negligence was clearly proven, indeed there was no evidence to the contrary.

This necessarily disposes of defendant's complaints in respect to the first instruction because under the proof in this case it was not proper to submit to the jury the question as to whether the failure of defendant to drop the prophylactic in the eyes of the child constituted an act of negligence. The sole question to submit to the

jury, aside from the measure of damages and "the 9 or more instruction," was whether the established negligence of the defendant was the proximate cause of the injuries, if, of course, the evidence was sufficient to submit that issue to the jury, which point we will now discuss.

The father of plaintiff had become infected with gonorrhea some two years before the birth of the child and had had intercourse with his wife to within two months thereof. The child was born on the 22d day of January, 1939. While there was evidence to the contrary, plaintiff introduced proof that on the 24th (48 hours later) his eyes became irritated; on the 25th very red; on the 26th (4 days after birth) pus appeared; on the 27th they called Dr. J. W. Parker who attended the child and wrote a prescription for silver nitrate. Dr. Parker, testifying for defendant, denied that he was called until the 30th but the prescription he wrote was filed in evidence and shows that it was dated January 27th, although 30 is marked over the 27. The physicians who testified in the case stated that infection from the mother generally sets in from 48 to 72 hours after the birth of the child and that pus generally appears by the fifth day; that the disease could be communicated from the father to the mother and when that occurred the mother generally became actively infected; that the mother could have been infected without knowing it. Ten days after the child was born, at the suggestion of the defendant, the mother and child went to a clinic in Knoxville, Tennessee. A specialist at the clinic pronounced him totally blind from gonococci infection. A microscopic examination made of a smear taken from the mother on that occasion was reported to have been negative, but, it was shown by medical testimony that such an examination is not satisfactory and does not conclusively prove that the mother is free from infection. The day after the baby was born, a maid was engaged to perform menial services in the household, and, while there is some testimony to the effect that she handled the baby as soon as she came to work at the house, she denied having touched the child until after his eyes became sore. Dr. Parker stated that two months after the child was born, he examined the maid and at that time she was infected with a chronic case of gonorrhea. The maid emphatically denied that she was so infected or that she had ever been infected with such disease. The defendant tes-

tified that he did not see the maid in the house on any of his visits until after the infection set in. This testimony is corroborative of the evidence given by the maid that she was not employed to nurse the child, did not nurse him, and merely performed menial duties. While there is conflict in evidence on this point, the evidence for plaintiff shows that the father did not touch the child until after the infection set in and the only persons who touched the child were the two grandmothers and a practical nurse, who assisted the doctor at the birth. Further evidence of the existence of infection at the time of the birth is the fact that both eyes were infected. That condition, in reason, would be more apt to exist if the infection were obtained from the mother at birth than if it were contracted after birth from an outside agency. If the infection had appeared in but one eye, such fact would have inclined the mind to the opinion that the infection had come from an outside source. The fact that there is evidence that the infection could have come from the maid or from the father after the child was born merely raises an issue of fact for the determination of the jury, and whose decision, once made, becomes final and binding on this court. We therefore conclude that the trial court properly submitted the case to the jury.

Further complaint is made that the court committed prejudicial error in permitting the child to cry in the courtroom during the closing argument of counsel for the defense, but we cannot agree with this contention. It is true that counsel making the argument had the right to do so without being interrupted by the cries of the child or any other noise that could be abated. The court and counsel for plaintiff realizing this, caused the child to be taken out of hearing of the jury, but they were not responsible for the spontaneous wailing of the infant until they had an opportunity to know it would be disturbing.

Complaint is made of the admission of incompetent evidence but since the judgment must be reversed for another reason and the same errors will likely not again occur, we deem it to be unnecessary to discuss this complaint, except to caution counsel to use more care on the second trial to stay within the limits allowed by the rules of evidence.

Finally, complaint is made of improper argument by counsel for plaintiff in making the following statement:

"When I saw the astute lawyer, Mr. L. R. Curtis, here appearing for the defendant in this case, I knew that a verdict in this case would not hurt Dr. Walden."

This complaint was made part of the bill of exceptions and certified by the court. Counsel for plaintiff attempts to explain the argument by saying in his brief that it was in response to a statement of attorney for defendants in closing argument to the effect that a verdict against the defendant would not only ruin Dr. Walden professionally but would destroy him financially. It may be true that the argument was responsive as argued, in which event the defendant would not be heard to complain, but nowhere in the bill of exceptions does it appear that counsel for the defendant made the statement attributed to him in plaintiff's brief and we cannot take cognizance of such statement unless it is properly certified to this court. We have never adopted the rule laid down in some jurisdictions to the effect that the party complaining of improper argument must present the whole argument in the bill of exceptions, nor have we adopted the rule that the bill of exceptions must show that the argument complained of was not in response to improper argument by opposing counsel. This court has followed the procedure that it will not consider any matter which is not contained in the bill of exceptions and, if the latter does not show that improper argument was responsive to argument of opposing counsel, it cannot be considered to be so. In the case of Evans Chemical Works v. Ball, 159 Ky. 399, 167 S. W. 390, the bill of exceptions certified by the trial judge recited that the argument complained of was in response to improper argument by opposing counsel but did not recite the text. It was held that since the opposing counsel's argument was not before the court, it would be presumed that the argument complained of was responsive because the trial court had so certified in the bill of exceptions. We are not disposed to be more lenient in our requirement that occurrences at the trial be certified in the bill of exceptions before they can be relied on in this court. We have often condemned any argument or evidence being presented in a case from which the jury could infer that the defendant was indemnified by insurance, and if counsel for plaintiff, either by evidence or by argument, injects any circumstance or statement from which an inference may be drawn that the defendant is indemnified,

he must suffer the consequence of a reversal of any judgment which he might obtain. We think that the jury in reason could have inferred from the statement made that the defendant was covered by insurance but if that were not true, the statement certainly related to the financial condition of the defendant which is improper argument in any case. There is no law applicable to the poor that is not likewise applicable to the rich, nor is any law applicable to the rich that is not likewise applicable to the poor, and an endeavor on the part of an attorney or litigant to inflame the minds of the jury by referring to the financial status of either of the parties is improper. While such reference is not always prejudicial, we believe it to have been in this case, because the question as to the proximate cause of the injury is so close that the slightest suggestion in the closing argument of any matter extraneous to the record might have been sufficient to tip the scales in favor of the offending party.

For that reason we have concluded, after much deliberation, that the judgment should be, and it hereby is, reversed for proceedings not inconsistent with this opinion.

Whole Court sitting.

Judge Cammack dissents from so much of this opinion as holds the evidence as to the proximate cause of the injuries to be sufficient to submit the case to the jury.