OPINION OF THE COURT
David O. Boehm, J.
In this medical malpractice action brought by the plaintiffs, Yolanda Renda and Vincent Renda, her husband, the defendants, Dr. John P. Frazer and University of Rochester, Strong Memorial Hospital (Strong), his employer, are moving under CPLR 3212 for an order granting summary judgment in their favor on the ground that the action is time barred.
Although the surgery which caused this action to be brought was performed on March 14, 1973, the action was not commenced against the defendants until summonses were served upon them on July 7, 1978 and July 11, 1978, some four years and five months after the operation. The action is governed by the earlier three-year Statute of Limitations.
The issues raised present a novel question for resolution. For many years Mrs. Renda was being seen and treated for rheumatoid arthritis by Dr. Ralph F. Jacox, an employee of Strong. In 1972, he referred her to Dr. Frazer because of a problem with her right ear. On March 14, 1973, Dr. Frazer performed a mastoidectomy and tympanoplasty upon the plaintiff and, in the course of removing an osteoma (bony tumor), severed a facial nerve. To repair the damage, he took a graft of the great auricular nerve and inserted it. Unfortunately, after the operation, Mrs. Renda was unable to move the muscles on the right side of her face and mouth, the right side of her nose, her right eyelid and right eyebrow.
Dr. Frazer admitted to Mrs. Renda that he had severed the *513 facial nerve. According to her, he told her that the nerve graft would start to grow after three to six months and would be fully restored in two to five years. Upon asking him if her face would be normal, he replied that everything would be all right.
Mrs. Renda saw Dr. Frazer on several occasions thereafter, the last time on October 23, 1973. According to her, she asked him then how long her face would be in that condition and he told her it would take a long time for the graft to heal and she should be patient. Dr. Frazer’s operative notes in the hospital record state: "The prognosis for resuming facial function would be favorable.”
Mrs. Renda continued to be seen and treated at Strong by other physicians, including Dr. Jacox. Although her purpose in seeing Dr. Jacox was essentially involved with her arthritis, nevertheless her facial condition runs like a related thread throughout his reports.
For example, on April 2, 1973, he writes that plaintiff was "considerably depressed and out of sorts because of the problem with the surgical severance of her right facial nerve” and that he "spent time today speaking with her about the likely possibility of regeneration of the nerve.” Significantly, he also notes that the nerve severance has "induced facial weakness on the right as well as inability to close her eyes. She is getting some secondary problem in the eye for which Dr. Hicks is treating her.” Thus, it is apparent that Mrs. Renda was, at the same time, receiving treatment for problems clearly related to her right facial paralysis.
On January 28, 1974, Dr. Jacox observes that the condition of Mrs. Renda’s nerve graft is "showing some slow, but very definite improvement of recovery of function.” And a year later, on February 18, 1975, he notes that Mrs. Renda again expressed concern about the palsy on the right side of her face and that they spoke about referring her to Dr. Satran, a neurologist and an employee of Strong. Dr. Jacox writes, "I think she wants to know whether this is permanent or not.”
Mrs. Renda was seen by Dr. Satran on March 13, 1975. According to her, Dr. Satran told her "the best thing was just to wait” as maximum improvement required time and he would recommend no further treatment. Dr. Satran’s written report states: "The fact that she is able to do more now with her face than she was six months ago should be taken as a sign of improvement. I don’t believe any diagnostic studies are *514 currently warranted * * * I asked her to call me in 3 to 4 months time and let me know of her progress and if she wishes we can make arrangement to re-examine her.”
According to Mrs. Renda, she consulted with Dr. Jacox again about one year later and discussed the possibility of returning to Dr. Satran but it was agreed that this was not necessary since Dr. Satran had not recommended further treatment.
On May 24, 1977, she saw Dr. Jacox again for her annual physical and he recorded "continuing right facial paralysis.”
Finally, on August 30, 1977, Mrs. Renda returned to Dr. Frazer. After examining her, Dr. Frazer told her that the nerve would not improve and that her facial paralysis was permanent. Approximately 10 Vz months later this suit was brought.
In resisting this motion for summary judgment, Mrs. Renda states that she did not bring suit sooner because she relied upon the statements of Dr. Frazer and the other physicians employed by Strong that the nerve would be restored and her face would return to normal. Accordingly, because of the relied upon misrepresentations made to her, she argues, the defendants should be stayed from interposing a Statute of Limitations defense.
Mrs. Renda also argues that defendants’ motion should be denied for the further reason that she was continuously treated at Strong by Strong physicians, including Dr. Frazer, between March 14, 1973 and August 30, 1977. Therefore, the Statute of Limitations should be tolled for that period of time.
The basic rule in medical malpractice cases is that the cause of action accrues and the Statute of Limitations begins to run when the tort occurs, rather than when it is discovered. The Court of Appeals has created two exceptions in (1) the foreign object rule (Flanagan v Mount Eden Gen. Hosp., 24 NY2d 427) and (2) the continuous treatment rule (Borgia v City of New York, 12 NY2d 151).
Under the continuous treatement rule, if the defendant continues to treat the plaintiff for the same or related condition or complaint, the period of limitations begins only at the end of the treatment.
The plaintiffs urge Fonda v Paulsen (46 AD2d 540) in support of their position that the continuous treatment rule should be applied here. In that case the plaintiff was operated *515 upon in 1969 by defendant Nelson to remove a growth. A biopsy was performed by defendant Oram, who stated the growth was noncancerous. Thereafter, the plaintiff was in an automobile accident in 1970, suffered a knee injury, and went back to Nelson for treatment. During the course of this treatment, the plaintiff continued to complain of pain in the same area where the growth had been removed. In 1972 another biopsy was taken and it was discovered that the plaintiff had a malignancy which should have been discovered in 1969. A malpractice action was brought in 1974, five years after the 1969 operation. Although there was a gap of 20 months between plaintiff’s last visit for the knee injury and the 1972 biopsy and a gap of 32 months between the 1969 and 1972 biopsies, the Third Department held that whether the treatment was "continuous” or not was, at the very least, a jury question.
"If a patient continues under post-operative observation by his physician” the court stated, "and is advised that his condition is being cured, this is as much 'treatment’ as affirmative acts such as surgery, therapy, or prescription of medicines [citation]. Any other view must be based on the erroneous supposition that only acts of commission, but not acts of omission, can constitute negligence; there would be little chance for legal redress by a patient who has been the victim of an alleged malpractice who is advised that time is the only barrier to a complete cure, when in reality time is a barrier to a cause of action.” (Fonda v Paulsen, supra, p 543; see, also, Miller v Wells, 58 AD2d 954.)
However, the same rule does not apply to intermittent treatment where there are substantial gaps of time between consultations (see Matter of Beary v City of Rye, 44 NY2d 398; Davis v City of New York, 38 NY2d 257), and it would seem that insofar as Dr. Frazer is concerned, at least, the plaintiffs may not rely upon the continuous treatment rule. There was simply too long a lapse of time between visits from October 23, 1973 until August 30, 1977, a period of 46 months, for Mrs. Renda’s contacts with Dr. Frazer to be considered anything other than intermittent treatment. Further, the advice given by the other doctors in the interim may not be imputed to Dr. Frazer, as was the case with the erroneous interpretation of the original biopsy by the pathologist in Fonda v Paulsen (supra). Dr. Frazer did not depend or rely upon the other doctors’ opinions, nor did they upon his. All of the physicians *516 in this case, except for referrals, acted independently of each other. Accordingly, were it not for the application of estoppel,, it would be necessary to grant the defendants’ motion as to Dr. Frazer.
However, the same reasoning does not apply to defendant, Strong. Although Mrs. Renda’s primary purpose in seeing Dr. Jacox, an employee of Strong, was not with respect to the severed facial nerve, nevertheless she constantly took this condition up with him and on each of the visits he undertook to give her a favorable and encouraging medical prognosis. On one occasion he referred her to Dr. Satran, another Strong employee, with respect to that same condition and Dr. Satran examined her on March 13, 1975; he, too, advised her medically with respect to it. Approximately one year later, Dr. Jacox examined Mrs. Renda again and the possibility of seeing Dr. Satran again was discussed and decided against. And in the visit to Dr. Jacox of April 2, 1973, we are told that Mrs. Renda was also seeing Dr. Hicks, presumably another Strong employee, for a secondary problem with an eye resulting from the severed nerve. Finally, on August 30, 1977, Mrs. Renda saw Dr. Frazer, another Strong employee, and, for the first time, was told that her condition was permanent.
Although the doctors who examined Mrs. Renda may have been different, it is clear that all of them discussed her facial condition with her and, more importantly, treated or advised her medically regarding it. Since they were all employees of Strong, obviously acting within the scope of their authority, their treatment of Mrs. Renda becomes Strong’s treatment. Although it would appear on the face of it that such treatment was continuous, that issue would at the very least, under Fonda v Paulsen (46 AD2d 540, supra), be a jury question and, accordingly, the motion of defendant, Strong, is denied.
Plaintiffs’ argument that Dr. Frazer’s motion may not be granted for the further reason that he is estopped from asserting the Statute of Limitations, rests upon firmer ground. The law is that estoppel bars the application of the period of limitations "where plaintiff was induced by fraud, misrepresentations or deception to refrain from filing a timely action.” (Simcuski v Saeli, 44 NY2d 442, 449.)
However, there is no claim here, as there was in Simcuski v Saeli (supra), that Dr. Frazer fraudulently or deliberately misled plaintiffs. It is undisputed that he candidly admitted *517 that he had severed the facial nerve. The question, therefore, to be decided is whether equitable estoppel may be invoked where Dr. Frazer gave an opinion, presumably in good faith, which turned out to be erroneous. Otherwise stated, does an erroneous, but honest, medical opinion constitute the misrepresentation required for equitable estoppel?
The doctrine of equitable estoppel applies if the representations or conduct of a defendant mislead the plaintiff, even innocently. "Under these circumstances, the doctrine of equitable estoppel will be applied to prevent defendant from gaining an unconscionable advantage if he were permitted to plead the statute; and it is immaterial that defendant intended no wrong. (See 21 N.Y. Jur., Estoppel, § 24; 31 C.J.S., Estoppel, § 69, and cases cited; Ann. 130 A.L.R. 49, supra; 24 ALR2d 1435, and cases cited.)” (Robinson v City of New York, 24 AD2d 260, 263; emphasis supplied; see, also, Dupuis v Van Natten, 61 AD2d 293; Fraud, Misrepresentation, or Deception as Estopping Reliance on Statute of Limitations, Ann. 43 ALR3d 429, 444.)
The general rule is that: "A physician is under obligation, in making disclosure to the patient as to the latter’s condition, the results of the treatment administered, the possibility of cure, and the like, to speak fairly and truthfully, at the peril of being held liable for damages for fraud and deceit. Thus when a physician tells the patient that a cure will be effected, he is on dangerous ground, for such talk may be misrepresentation of a fact which should have been known to the physician and which makes him liable to damages in an action of deceit brought by the patient.” (61 Am Jur 2d, Physicians and Surgeons, § 99; see, also, 37 Am Jur 2d, Fraud and Deceit, §82.)
Although there are no New York cases directly on point, an examination of cases from other jurisdictions is instructive.
In Adams v Ison (249 SW2d 791 [Ky]), a doctor left a rubber tube in his patient’s stomach during the course of an operation. When the patient discovered this, the doctor assured him that it would be absorbed by normal bodily processes and that no further surgery was required. Absorption did not, in fact, take place and the patient sued the doctor for malpractice. In rejecting the doctor’s claim that the Statute of Limitations was a bar to the action, the court stated (pp 793-794):
"[T]hough deception is involved, bad faith, evil design or an *518 intent by the wrongdoer to deceive or mislead or defraud in the technical sense is not essential * * *
"The relationship of a patient to his physician is by its very nature one of the most intimate. Its foundation is the theory that the physician is learned, skilled and experienced in the afflictions of the body about which the patient ordinarily knows little or nothing but which are of the most vital importance to him. Therefore, the patient must necessarily place great reliance, faith and confidence in the professional word, advice and acts of his doctor. It is the physicians’ duty to act with the utmost good faith and to speak fairly and truthfully at the peril of being held liable for damages for fraud and deceit. 41 Am. Jur., Physicians and Surgeons, Secs. 70, 73, 74; 70 C.J.S., Physicians and Surgeons, § 36; Cf. Walden v. Jones, 289 Ky. 395, 158 S.W.2d 609, 141 A.L.R. 105. Since the relationship of physician and patient begets confidence and reliance, a liberal attitude should be taken in behalf of the patient.” (See, also, Simcuski v Saeli, 44 NY2d 442, supra.)
The court in Adams went on to hold that whether the defendant should be estopped from asserting the Statute of Limitations was a question of fact for the jury.
Similar results were reached in Groendal v Westrate (171 Mich 92) in which a doctor had represented to a patient that her shoulder was not dislocated when, in fact, it was.
In Louisville & Nashville R. R. Co. v Disspain (275 F2d 25) a case decided under the Federal Employers’ Liability Act (US Code, tit 45, § 51 et seq.), the Sixth Circuit affirmed the trial court’s holding in a case in which the plaintiff sued his employer for injuries sustained in a work-related accident which occurred some six years prior to commencement of the suit. The plaintiff argued that the defendant should be estopped from interposing the Federal Employers’ Liability Act’s three-year Statute of Limitations because the doctor to whom the plaintiff had been sent by the defendant had told the plaintiff that there was nothing wrong with him. The Trial Judge submitted the issue to the jury as a question of fact with the following instruction: " 'The Court charges you that if you find that the representations made to plaintiff by the doctor chosen by the defendant to examine the plaintiff, were in fact misrepresentations although unintentional on the part of the doctor, and plaintiff failed to institute suit within three years because of such misrepresentations, such misrepresentations were sufficient to toll, that is to stop, the three-year *519 statute of limitations.’ ” (Louisville & Nashville R. R. Co. v Disspain, supra, p 26; see, also, Mumpower v Southern Ry. Co., 270 F Supp 318.)
It would seem that in every doctor-patient relationship the words of a doctor to his patient could almost never be characterized as a mere opinion in the ordinary sense of that word. Where the relationship exists, the doctor’s opinion with respect to the condition for which he is seeing the patient is in every case given by way of diagnosis, recommended treatment or prognosis. Opinion, based on his special knowledge and training, is what the doctor offers always. Accordingly, where the doctor’s opinion, given in the course of treatment, is incorrect and the patient relies upon it to his detriment, as here, then such mistaken opinion, albeit innocent, properly falls within that category of misrepresentation which the law requires for the application of equitable estoppel. At the very least, as the cases discussed have held, it is a jury question precluding the granting of summary judgment and the court so holds.
With respect to the question of plaintiffs’ due diligence in bringing this action, no explanation has been given for their delay of 10 Vi months.
In Simcuski v Saeli (44 NY2d 442, supra), the Court of Appeals was confronted with an even longer delay, approximating IV2 years. The then three-year Statute of Limitations had expired in October, 1973. The court held that the burden was imposed upon the plaintiff to prove due diligence in bringing the action, stating (p 450): "The preferable analysis * * * holds that due diligence on the part of the plaintiff in bringing his action is an essential element for the applicability of the doctrine of equitable estoppel, to be demonstrated by the plaintiff when he seeks the shelter of the doctrine (see Plaintiff’s Diligence as Affecting His Right to Have Defendant Estopped From Pleading the Statute of Limitations, Ann., 44 ALR3d 760, § 7, pp 774-779). Under this approach, which we endorse, the burden is on the plaintiff to establish that the action was brought within a reasonable time after the facts giving rise to the estoppel have ceased to be operational. Whether in any particular instance the plaintiff will have discharged his responsibility of due diligence in this regard must necessarily depend on all the relevant circumstances.” Thus, the question of the plaintiffs’ due diligence in commencing this action is also one for a jury to decide.
*520 Accordingly, for the foregoing reasons, the defendants’ motion is denied in all respects.