### Michael OSTENDORF and Holly Ostendorf, Appellants,

v.

### CLARK EQUIPMENT COMPANY, Clark Lift of California, and Pacific Employers Insurance, Appellees.

### No. 2000–SC–0323–DG.

Supreme Court of Kentucky.

Dec. 18, 2003.

Kevin L. Murphy, David C. Nalley, Murphy & Associates, P.S.C., Covington, Thomas C. Lyons, Lexington, Counsel for Appellants.

Elizabeth U. Mendel, Christopher R. Cashen, Kara MacCartie Stewart, Woodward, Hobson & Fulton, L.L.P., Lexington, Stanley V. Boychuck, Swanson, Martin & Bell, Chicago, IL, Counsel for Appellee, Clark Equipment Company.

Christopher R. Cashen, Woodward, Hobson & Fulton, L.L.P., Lexington, Stanley V. Boychuck, Swanson, Martin & Bell, Chicago, IL, Counsel for Appellee, Clark Lift of California.

George T.T. Kitchen, III, Boehl, Stopher & Graves, Louisville, Counsel for Appellee, Pacific Employers Insurance.

JOHNSTONE, Justice.

Michael Ostendorf was severely injured when the Clark forklift he was driving tipped over and pinned his right foot to the ground. The accident occurred when a baggage tug vehicle operated by another employee collided with the forklift Ostendorf was driving. The accident occurred in October 1994 at the Delta Airlines terminal of the Greater Cincinnati–Northern Kentucky International Airport in Boone County, Kentucky. Ostendorf was employed by Delta at the time.

Ostendorf and his wife filed suit in Kenton Circuit Court against Clark claiming (1) strict product liability, (2) negligent design, (3) breach of duty to retrofit the forklift with operator restraints, (4) negligent conduct of the retrofit campaign, and (5) breach of warranty. In addition to compensatory damages, Ostendorf sought punitive damages. The circuit court granted summary judgment in favor of Clark. Ostendorf appealed to the Court of Appeals, which reversed the summary judgment on the strict liability and negligent design claims, as well as the compensatory and punitive damages relating to those claims. The Court of Appeals further held that Kentucky does not recognize a common law duty by a seller to retrofit an existing product that was not defective at the time it was manufactured. Finally, the Court of Appeals held that Ostendorf failed to present sufficient evidence to impose liability on Clark for negligent performance of a voluntary retrofit campaign. We affirm the Court of Appeals' decision.

Because this matter was disposed of on a motion for summary judgment, we shall review the facts of this case in the light most favorable to the Appellant. *See* *Steelvest. Inc., v. Scansteel Service Center, Inc.,* Ky., 807 S.W.2d 476 (1991). The forklift Ostendorf was operating was a 1980 model C–300Y40 manufactured by Clark Equipment Company. It was sold to Western Airlines by an authorized Clark dealer in California. Delta Airlines acquired the forklift when it purchased the assets of Western Airlines. The forklift was designed and manufactured in accordance with the then applicable industry standards, as set out by the Federal Occupational Safety and Health Act (OSHA)

and the American National Standards Institute (ANSI). At the time the forklift was manufactured, operator restraints were not required.

Ostendorf presented evidence that Clark and other manufacturers of forklift trucks exercised considerable influence on the formulation of the ANSI standards through their membership in the Industrial Truck Association (ITA). Since the 1960's, Clark and the ITA were aware of the tendency of forklift trucks to overturn under certain circumstances, causing injury and death to the operator. However, there was considerable debate throughout the 1970's regarding the need to install operator restraints. In 1979, a Clark engineer was killed when a forklift that he was test driving overturned. This incident, among other things, prompted Clark to further study the need for operator restraints.

In 1983, Clark developed a new safety seat incorporating an operator restraint for its forklifts. In addition, Clark voluntarily implemented a retrofit program that provided owners of the C–300 and C–500 model forklifts with the opportunity to have the new restraint system installed on their forklifts. Under this program, Clark offered to retrofit qualifying forklifts without cost either for parts or for labor. Clark mailed notices to its customers advising them of the availability of the retrofit. There is a dispute concerning whether Delta received notice of the retrofit program; Clark claims it mailed the notice to Delta, but Delta denies receipt.

On appeal to this Court, Ostendorf argues that (1) Clark had a common law duty to retrofit its forklifts; (2) Clark negligently conducted the retrofit program; (3) Clark failed to meet the standard for an appropriate retrofit campaign under the standard set out in the Restatement (Third) of Torts, which this Common-

wealth should adopt; and (4) punitive damages should not require intentional conduct. Clark does not cross-appeal the decision of the Court of Appeals to reinstate the negligence and strict liability claims.

## DUTY TO RETROFIT

■ Ostendorf first argues that a product manufacturer has an affirmative, common law duty to retrofit existing products with safety features that are necessary to make the product reasonably safe. Ostendorf arrives at this duty based on principles of negligence: foreseeability and reasonable care. In a well-reasoned opinion by Judge Knopf, the Court of Appeals held to the contrary, declaring that Kentucky does not recognize a common law duty by a seller to retrofit an existing product which was not defective at the time it was manufactured with subsequently developed safety features. We agree with the Court of Appeals, with one exception. We think the relevant point in time is not when the product is manufactured, but when it is sold.

■ In Kentucky, the existence of a duty is a matter of law for the court because "[w]hen a court resolves a question of duty it is essentially making a policy determination." *Mullins v. Commonwealth Life Ins. Co.*, Ky., 839 S.W.2d 245, 248 (1992). A duty to retrofit is a duty to upgrade or improve a product. Some courts have created such a duty in certain, limited circumstances. For example, in *Braniff Airways, Inc. v. Curtiss–Wright Corp.*, 411 F.2d 451 (2d Cir.1969), plaintiff Braniff purchased an airplane engine from Curtiss–Wright. The engine was installed on one of Braniff's passenger airplanes, which later crashed; it was determined that the engine was the cause. Finding that an airplane engine was a product involving "human safety," the Sec-

ond Circuit held: "It is clear that after such a [human-safety] product has been sold and dangerous defects in design have come to the manufacturer's attention, the manufacturer has a duty either to remedy these or … at least to give users adequate warnings and instructions concerning methods for minimizing the danger." *Accord Noel v. United Aircraft Corp.*, 342 F.2d 232, 236–37 (3d Cir.1964) (duty of care owed by the manufacturer of an airplane propeller system, "an instrumentality likely to endanger the public"). In one case, a Texas court created a duty to retrofit where the service representative of a helicopter manufacturer purchased and resold one of the company's used helicopters but failed to install an improved tail rotor developed to prevent a known flight hazard. *See Bell Helicopter Co. v. Bradshaw*, 594 S.W.2d 519 (Tex.Civ.App.1979). While the few cases finding a duty to retrofit often involve products that directly implicate human safety, that is not always the case. One court found a duty to retrofit a mining shovel where the total number of units sold was so small, 120, that it was easily feasible for the manufacturer to retrofit the product or warn buyers of the danger. *See Readenour v. Marion Power Shovel*, 149 Ariz. 442, 719 P.2d 1058 (1986). And one court has even held, without qualification, that "failure to conduct an adequate retrofit campaign may constitute negligence apart from the issue of defective design." *Hernandez v. Badger Const. Equip. Co.*, 28 Cal.App.4th 1791, 34 Cal. Rptr.2d 732 (1994) (court affirmed jury finding that crane manufacturer could be liable for failing to install later developed safety device on crane that was not defective when sold); *but see Tabieros v. Clark Equip. Co.*, 85 Hawai'i 336, 944 P.2d 1279 (1997) (concluding there is no duty to retrofit and criticizing both the *Readenour* and *Hernandez* decisions as wanting "any

discernible reason explaining their implicit adoption of a duty to retrofit").

But the majority of jurisdictions reach a different conclusion: there is no duty to retrofit a product not defective when sold. *See* 47 A.L.R. 5th 395. We find the majority reasoning persuasive and we find the result appropriate. There are two main reasons militating against a duty to retrofit. First, in many cases, a duty to retrofit is properly the province of an administrative or legislative body. Second, and more importantly, there is no reason to create a duty to retrofit a product not defective when sold—traditional principles of negligence and strict products liability suffice.

A retrofit campaign may be a costly undertaking. It is typically a multi-step, multi-party process that may cost millions of dollars. *See* Douglas R. Richmond, "Expanding Products Liability: Manufacturers' Post–Sale Duties to Warn, Retrofit and Recall," 36 Idaho L.Rev. 7, 10 (1999). The complexity of the decision to retrofit and the ramifications of that decision recommend that courts should not make that determination, but rather should leave it to governmental bodies more suited to the task. *See, e.g., Gregory v. Cincinnati Inc.*, 450 Mich. 1, 538 N.W.2d 325, 334 (Mi. 1995); *Patton v. Hutchinson Wil–Rich Mfg. Co.*, 253 Kan. 741, 861 P.2d 1299, 1315 (1993). Professor Schwartz, principal author of The Uniform Product Liability Act, cautions persuasively against a duty to retrofit by judicial fiat:

[C]ourts that impose a post-sale obligation to remedy or replace products already in the marketplace arrogate to themselves a power equivalent to that of requiring product recall. Product recalls, however, are properly the province of administrative agencies, as the federal statutes that expressly delegate recall authority to various agencies suggest. As Congress has recognized, ad-

ministrative agencies have the institutional resources to make fully informed assessments of the marginal benefits of recalling a specific product. Because the cost of locating, recalling, and replacing mass-marketed products can be enormous and will likely be passed on to consumers in the form of higher prices, the recall power should not be exercised without extensive consideration of its economic impact. Courts, however, are constituted to define individual cases, and their inquiries are confined to the particular facts and arguments in the cases before them. Decisions to expand a manufacturer's post-sale duty beyond making reasonable efforts to warn product users about newly discovered dangers should be left to administrative agencies, which are better able to weigh the costs and benefits of such action. [Schwartz, The post-sale duty to warn: Two unfortunate forks in the road to a reasonable doctrine, 58 N.Y.U.L.Rev. 892, 901.]

■■■ These considerations aside, there is a more fundamental reason to eschew imposition of a duty to retrofit: that duty is superfluous in light of existing negligence and product liability doctrines. *See Tabieros,* 85 Hawai'i 336, 944 P.2d 1279. A party injured by a product can bring suit for that injury under three different theories: (1) breach of warranty under the Uniform Commercial Code, (2) negligence, or (3) strict liability in tort. *See Williams v. Fulmer,* Ky., 695 S.W.2d 411 (1985). When the case involves a retrofit, the plaintiff is claiming the product was defectively designed. Here, for example, Ostendorf claims the C–300 forklift was defectively designed because it did not have operator safety restraints. A plaintiff in Kentucky can bring a defective design claim under either a theory of negligence or strict liability. The foundation of both theories is that the product is "unrea-

sonably dangerous." *Ulrich v. Kasco Abrasives Co.,* Ky., 532 S.W.2d 197, 200 (1976). Whereas negligence examines the conduct of the manufacturer—could the manufacturer foresee the harm to the plaintiff and did the manufacturer act reasonably to prevent that harm—strict liability typically evaluates the condition of the product. But in a negligent design case, even a strict liability claim examines the manufacturer's conduct. *See Nichols v. Union Underwear Co. Inc.,* Ky., 602 S.W.2d 429 (1980) (distinction between strict liability and negligence "is of no practical significance so far as the standard of conduct required of the defendant"). So under either theory, it is the legal duty of a manufacturer to use reasonable care to protect against foreseeable dangers. In a design defect case, courts use some form of risk-utility analysis to assess the decisions made by manufacturers with respect to the design of their products. *See Prentis v. Yale Mfg. Co.,* 421 Mich. 670, 365 N.W.2d 176, 183 (1984); *see also* David J. Leibson, 13 *Kentucky Practice: Tort Law* § 13.7, p. 384 (1995). Because a manufacturer chooses the design of its product, the emphasis is on the manufacturer's conduct, not the product:

A conscious decision to design a product in a certain manner necessitates that the focus be on conduct rather than the product. Hence, the trier of fact must employ a risk-utility balancing test that considers alternative safer designs and the accompanying risk pared against the risk and utility of the design chosen "to determine whether ... the manufacturer exercised reasonable care in making the design choices it made."

*Gregory,* 538 N.W.2d at 329–30 (internal citations omitted). Significantly, the risk-utility test examines what the manufacturer knew or should have known *at the time the product was sold.*

In *Gregory*, the Michigan Supreme Court considered the propriety of instituting a duty to retrofit. That case involved a worker injured in 1986 by an industrial machine that was not defective when manufactured in 1964. The injured worker argued that the manufacturer had a duty to retrofit its product with later designed safety devices, but the court refused to create such a duty. As the *Gregory* court explained, there are two retrofit scenarios: a retrofit for a latent defect or a retrofit because of a technological advance. *See Gregory*, 538 N.W.2d at 325. A latent defect is one that existed undiscovered at the time of manufacture. Because a manufacturer's liability for a design defect hinges on what it knew or should have known at the time of sale, a negligence or strict liability theory can assess liability for a latent defect, so a duty to retrofit is unnecessary. If, however, the retrofit results from a post-sale technological advance, then the product was not originally defective, but has become so due only to the later advancement. That poses a problem under the traditional theories because "[f]ocusing on post[sale] conduct in a negligent design case improperly shifts the focus from point-of-[sale] conduct and considers post[sale] conduct and technology that accordingly has the potential to taint a jury's verdict regarding a defect." *Id.* at 334. The result is that liability for a post-sale defect would have to be premised on some other theory, like an independent duty to retrofit. But there are prevailing reasons not to impose such liability on manufacturers for post-sale advances, chiefly: "[I]mposing a duty to update technology would place an unreasonable burden on manufacturers. It would discourage manufacturers from developing new designs if this could form the bases for suits or result in costly repair...." *Id.* at 337; *see also* Restatement (Third) of Torts: Products Liability § 11, Comment a (1998). Placing such an onerous burden on manufacturers would be tantamount to making strict liability absolute liability and making a manufacturer an insurer. *See Modelski v. Navistar Int'l. Trans. Corp.*, 302 Ill.App.3d 879, 236 Ill.Dec. 394, 707 N.E.2d 239, 247 (1999); *Jones v. Hutchinson Mfg. Inc.*, Ky., 502 S.W.2d 66, 70 (1973). This we decline to do.

A duty to retrofit is an example of a post-sale obligation imposed on a manufacturer. Other examples are the duty to warn of later-discovered defects or foreseeable misuses and the duty to recall a defective product. Numerous cases impose a duty to warn of later discovered defects.[1] *See, e.g., Gracyalny v. Westinghouse Elec. Corp.*, 723 F.2d 1311, 1318 (7th Cir.1983) (manufacturer's duty to warn extends to dangers that arise after marketing); *LaBelle v. McCauley Indus. Corp.*, 649 F.2d 46, 49 (1st Cir.1981) (manufacturer's duty to warn extends to purchaser even if defects are discovered after initial sale); *Chrysler Corp. v. Batten*, 264 Ga. 723, 450 S.E.2d 208, 211–13 (1994) (duty to warn arises whenever manufacturer knows or reasonably should know of danger arising from product use). When a product is defective, a manufacturer may be subject to one of these post-sale duties. The nature of the defect will dictate the appropriate remedy: a defect that may result in a few minor injuries may only require a warning, whereas a defect that may result in serious injury or death could require more. These remedial measures can be seen as "a continuum of post-sale duties which the law might impose...." *Gregory*, 538 N.W.2d at 341 (Cavanagh, J., dissenting).

---

1. The present case does not present the issue of a duty to warn. Our discussion addresses that topic only generally, as it relates to the issues in this case.

One writer has suggested that post-sale claims might provide some advantages to traditional claims of negligence and strict liability:

> Post-sale claims afford plaintiffs strategic advantages not available in typical products liability cases. For example, a post-sale failure-to-warn claim may allow a plaintiff to avoid a statute of repose, may negate a state-of-the-art defense, may allow a plaintiff to avoid a defense based on a user's substantial modification of a product, or may allow before a jury otherwise inadmissible evidence.

Richmond, 36 Idaho L.Rev. at 10. After examining these considerations, we are persuaded that they have little validity in design defect cases in Kentucky. First, Kentucky has no statute of repose for product-related claims. Next, in a design defect case, unlike in a duty to warn case, the state-of-the-art defense is still viable and cannot be circumvented because, as discussed, *supra,* the critical time period is before the product is sold. The next consideration, a user's substantial modification of the product that makes the product defective, can be dealt with under existing theories of liability. Finally, in some jurisdictions, evidence of subsequent remedial measures is not admissible to prove the product was defective. *See Readenour,* 719 P.2d at 1061, *citing* A.R.S. § 12–686 (in product liability action, subsequent changes in design or state of the art not admissible as direct evidence of a defect). But in product liability actions in Kentucky, evidence of subsequent remedial measures is admissible. *See* KRE 407. Not only are we unpersuaded by these reasons, but we see no other good reason to create an independent duty to retrofit.[2]

Accordingly, if Ostendorf can prove what he claims, that Clark's product was defective when sold, then he can recover under existing theories of negligence or strict liability.

## LIABILITY FOR VOLUNTARY RETROFIT CAMPAIGN

■ Ostendorf next argues that Clark is liable to him because of its retrofit campaign. Ostendorf's claims are based on the voluntary retrofit program Clark began after developing safety improvements in 1983. Although Clark had begun to retrofit its model C–300 forklifts, the forklift involved in the accident injuring Ostendorf was never retrofitted. While not clear from Ostendorf's brief in this appeal, it appears from the Court of Appeals' opinion that Ostendorf claims Clark "failed to adequately notify customers of the availability of and the need for the new safety features, and that it failed to provide its dealers with sufficient incentives to implement the retrofit program." Clark maintains that it mailed Delta notice of the program in 1985, but Delta denies ever receiving the notice. Ostendorf first contends that, under the common law principle of voluntary assumption of a duty, Clark negligently conducted its retrofit campaign. Ostendorf next asserts that Clark failed to meet the standard for an appropriate retrofit campaign under the Restatement (Third) of Torts: Products Liability § 11 (1998).

Ostendorf's common law argument is that a manufacturer who voluntarily undertakes a retrofit program can be held liable for negligently performing that program. Ostendorf looks, in part, to *Bell Helicopter,* 594 S.W.2d 519, to support his claim. In that case, the manufacturer be-

---

**2.** Our opinion does not address the case, as in *Bell Helicopter Co.,* 594 S.W.2d 519, where the manufacturer or its representative reacquires the product but fails to retrofit it with subsequently developed safety features.

gan a retrofit campaign to remedy a defective tail rotor system in a helicopter, but the helicopter flown by the plaintiffs had not yet been retrofitted when it crashed. The Texas Court of Civil Appeals held that Bell assumed the duty to improve upon the safety of its helicopter by replacing the defective part in its helicopter line and "[o]nce the duty was assumed, Bell had an obligation to complete the remedy [in this particular helicopter] by using reasonable means available to it . . . ." *Bell Helicopter,* 594 S.W.2d at 532. But *Bell Helicopter* is easily distinguishable from the present case. In *Bell Helicopter,* a Bell-authorized service station purchased the helicopter before the accident but after the retrofit campaign had begun. The service station was aware of the retrofit and the danger a failure to retrofit posed. The service station sold the helicopter without retrofitting it and the crash followed. The court imputed the failure to retrofit to Bell. Unlike that case, the record in the case at bar is devoid of evidence that the defendant in any way had or regained control over the product that led to the plaintiff's injury.

■ Ostendorf also quotes well-settled Kentucky case law to support his case: "one who volunteers to act, though under no duty to do so, is charged with the duty of acting with due care." *Sheehan v. United Services Auto Ass'n,* Ky.App., 913 S.W.2d 4, 6 (1996); *see also Estep v. B.F. Saul Real Estate Inv. Trust,* Ky.App., 843 S.W.2d 911, 914 (1992). This is an accurate statement of the law, but falls short of attaching liability to Clark. As the Court of Appeals recognized, "traditionally, the purpose of imposing liability upon a party who has assumed a duty to act is premised upon reliance." *See, e.g., Louisville Cooperage Co. v. Lawrence,* 313 Ky. 75, 78, 230 S.W.2d 103, 105 (1950). The Restatement (Second) of Torts § 324A (1965), which considers liability based on negligent performance of an undertaking, includes reliance as one of three bases for imposing a duty:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
>
> > (a) his failure to exercise reasonable care increases the risk of such harm, or
> >
> > (b) he has undertaken to perform a duty owed by the other to the third person, or
> >
> > (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

Under this framework, Ostendorf would have to demonstrate not only that Clark undertook a retrofit campaign on the C–300 forklifts for the protection of third persons, but also that Clark's negligent performance of that task (a) increased the risk of harm to Ostendorf, (b) was incompatible with the discharge of a duty by Ostendorf's employer, Delta, or (c) caused Ostendorf to suffer harm because either Delta or Ostendorf relied on Clark to complete the retrofit. *See Tabieros,* 944 P.2d at 1302; *see also Flock v. Scripto–Tokai Corp.,* 2001 WL 34111725, 2001 U.S. Dist. Lexis 23885 (S.D. TX 2001); *Morrison v. Kubota Tractor Corp.,* 891 S.W.2d 422 (Mo.App.1994); *but see Blossman Gas Co. v. Williams,* 189 Ga.App. 195, 375 S.E.2d 117 (1988). While it is clear that Clark began a retrofit campaign, there is no evidence that any of the three additional conditions existed. In fact, regarding reliance, Delta and Ostendorf deny ever receiving notice of the retrofit program from Clark. As discussed, *supra,* the existence

of a duty is essential to a negligence claim. In the absence of one of these three conditions, Clark owed no duty to Ostendorf based on the voluntary retrofit campaign.

The Restatement (Third) of Torts: Products Liability § 11 (1998), however, does not impose such stringent requirements to establish liability, at least in the context of product recalls. That section provides:

> One engaged in the business of selling or otherwise distributing products is subject to liability for harm to persons or property caused by the seller's failure to recall a product after the time of sale or distribution if:
>
> (a)(1) a governmental directive issued pursuant to a statute or administrative regulation specifically requires the seller or distributor to recall the product; or
>
> (a)(2) the seller or distributor, in the absence of a recall requirement under Subsection (a)(1), undertakes to recall the product; and
>
> (b) the seller or distributor fails to act as a reasonable person in recalling the product.

Ostendorf argues that § 11(a)(2) applies to this case. Ostendorf further alleges that Clark's voluntary recall was merely an attempt to avoid a government mandated recall or retrofit, as explained in Comment c to § 11:

> In the context of products liability, courts appear to assume that voluntary recalls are typically undertaken in the anticipation that, if the seller does not recall voluntarily, it will be directed to do so by a governmental regulator. Having presumably forestalled the regulatory recall directive, the seller should

be under a common-law duty to follow through on its commitment to recall.

But § 11 has not been adopted in Kentucky. And Ostendorf fails to cite a single case from any jurisdiction that relies on § 11 to impose liability on a manufacturer for a negligent retrofit campaign. More importantly, adopting the § 11 approach—with its lax requirements—would have the perverse effect of discouraging voluntary retrofits and recalls. A retrofit campaign is a complex process requiring an abundance of technical, administrative, and legal coordination. Imposing liability on a company for a good faith—but perhaps incomplete—effort to undertake that task might dissuade that company from acting until required to by a government directive. Moreover, a company that would have begun a voluntary campaign in the absence of such strict liability but refrains in the face of such liability might never be compelled to perform that campaign.[3] The result is delay in the first instance and complete omission in the second, and a heightened risk of injury to consumers either way. In the interest of the safety of the citizens of this Commonwealth, we decline to adopt § 11.

We think the better course is to impose liability under the dictates of the Restatement (Second) § 324A, which requires proof of reliance, action inconsistent with a duty owed by another party, or increased risk of harm. As discussed, *supra*, and by the Court of Appeals: "If a product was defective at the time of [sale], then the seller may be liable for injuries resulting from that defect. However if the product was not defective at the time of [sale], the seller's post[sale] conduct must contribute to the injury before liability will be imposed." Based on the facts in this case,

---

**3.** We are aware of no law preventing the appropriate government agency from making a voluntary recall mandatory. The importance of this, of course, is that a manufacturer cannot truly forestall a government imposed retrofit by initiating a voluntary one.

we hold that by initiating a voluntary retrofit campaign, Clark did not assume a duty sufficient to impose liability for Ostendorf's injuries.

## CONSTITUTIONAL ISSUES

Ostendorf's last argument raises questions about the constitutionality of KRS 411.184, which deals with punitive damages in Kentucky. Ostendorf raises two concerns, one involving the *mens rea* required to support punitive damages—intentional conduct or gross negligence—and the other involving the standard of proof required to prove such damages, clear and convincing or preponderance of the evidence. Because the trial court granted summary judgment on the underlying claims, it did not touch upon the constitutional issues. In the absence of a ruling by the trial court, the Court of Appeals appropriately declined to rule on the matter, even though its decision reinstated claims upon which punitive damages could be founded. We likewise decline to consider constitutional arguments unaddressed by the lower courts.

For the foregoing reasons, we affirm the decision of the Court of Appeals.

LAMBERT, C.J.; COOPER, GRAVES, KELLER, and WINTERSHEIMER, JJ., concur.

STUMBO, J., *concurs in result only.*