RENDERED: MAY 21, 2009
TO BE PUBLISHED

# Supreme Court of Kentucky

## 2006-SC-000693-DG

DATE 10/1/09 _Kelly Klaber D.C._

TIMOTHY MORGAN                                                    APPELLANT

ON REVIEW FROM COURT OF APPEALS
V.     CASE NOS. 2004-CA-002350-MR AND 2004-CA-002363-MR
PIKE CIRCUIT COURT NO. 03-CI-01352

CANDRIA SCOTT
AND JAMES E. SCOTT, JR.                                          APPELLEES


AND                          2006-SC-000701-DG


CANDRIA SCOTT
AND JAMES E. SCOTT, JR.                                          APPELLANTS

ON REVIEW FROM COURT OF APPEALS
V.     CASE NOS. 2004-CA-002350-MR AND 2004-CA-002363-MR
PIKE CIRCUIT COURT NO. 03-CI-01352

MOORE PONTIAC, BUICK, GMC, INC.                                 APPELLEE


AND                          2007-SC-000282-DG


MOORE PONTIAC, BUICK, GMC, INC.                          CROSS-APPELLANT

ON REVIEW FROM COURT OF APPEALS
V.     CASE NOS. 2004-CA-002350-MR AND 2004-CA-002363-MR
PIKE CIRCUIT COURT NO. 03-CI-01352


CANDRIA SCOTT                                            CROSS-APPELLEES
AND JAMES E. SCOTT, JR.

**OPINION OF THE COURT**

**<u>AFFIRMIMG</u>**

<u>INTRODUCTION</u>

Among other issues, these appeals ask us to examine the extent of a car dealer's liability for injuries arising out of accidents that occur during a test drive. We hold that, at least under the facts presented, the dealer should not have been held liable.

We also consider the question of whether a tortfeasor to whom the jury apportioned only a portion of the liability for the plaintiffs' injuries becomes liable for all of the plaintiff's damages when, on appeal, it is determined that the remaining co-defendant, against whom fault was also apportioned, was not a proximate cause of the injury and should not have been found liable. We conclude that he does.

II. <u>FACTUAL AND PROCEDURAL HISTORY</u>.

The legal questions presented in these appeals are complex, but the essential underlying facts of the appeals are common and simple. Timothy Morgan stopped at Moore Pontiac, Buick, GMC, Inc., to test drive a Chevrolet Silverado pickup truck. After talking about the truck with Morgan for awhile, the salesperson allegedly copied Morgan's driver's license[1] and set off with

---

[1]   Although the copy of Morgan's driver's license made at Moore Pontiac was purportedly lost and, thus, never introduced into the record, we have been directed to no evidence suggesting that Morgan was not a licensed driver on the day of the test drive.

2

Morgan on a test drive.[2] Soon, however, the salesperson realized the truck was low on gas, which necessitated a return to the dealership. The salesperson testified that after refueling, he asked Morgan to wait while the salesperson talked to his manager; but Morgan drove off the lot in the Silverado with his family before the salesperson returned. In contrast, Morgan testified that a salesperson did not accompany him on the first test drive and that, believing he had permission to do so, he drove the Silverado off the lot with his girlfriend and child as passengers. What is undisputed is that Moore Pontiac's company policy required one of its employees to accompany a customer on a test drive.

During the test drive, Morgan lost control of the Silverado, crossed into another lane of traffic, and struck a vehicle driven by Candria Scott. A light misty rain was falling, and Morgan surmised that the Silverado hydroplaned. Candria Scott injured her knees and fractured her left femur.

Candria Scott and her husband, James, sued Morgan and Moore Pontiac to recover for Candria's injuries and James's loss of consortium. The Scotts claimed that Morgan had driven negligently and that Moore Pontiac had failed in its duties to ensure the safe operation of its vehicle. The case eventually went to trial, where Morgan admitted causing the accident. The trial court directed a verdict on Candria's past medical bills ($274,339.28). The jury

---

[2]  Much is made in the briefs about Morgan's only being twenty-one years old at the time of the test drive and to his allegedly "scraggly" appearance. Morgan's appearance and age are irrelevant to the legal issues in this case.

apportioned fault equally between Moore Pontiac and Morgan.[3] In addition to the past medical bills, the jury awarded Candria $1,160,200.00 in future medical bills; $500,000.00 in past mental or physical pain and suffering; $2,000,000.00 in future mental or physical suffering; and awarded James $100,000.00 for loss of consortium. The trial court entered judgment accordingly.[4]

Moore Pontiac and Morgan each filed an appeal. The Court of Appeals affirmed as to Morgan, but reversed as to Moore Pontiac, finding that "Moore Pontiac's adoption of the internal policy [requiring a Moore Pontiac employee to be present for test drives] does not expose it to liability to Scott . . . ." A divided panel of the Court of Appeals, however, granted the Scotts' petition for extension of its original opinion and issued a new opinion in which it added language remanding the case "with directions that Morgan be designated as liable for 100% of the assessed damages." Morgan, the Scotts, and Moore Pontiac all filed petitions for discretionary review. We granted discretionary review in all three cases, and we resolve all three in this combined opinion.

### III. ANALYSIS.

A. We Affirm the Court of Appeals as to the Scotts' Appeal.

---

[3] The Scotts also sued Moore Chevrolet, a sister dealership to Moore Pontiac that was the record title owner of the Silverado, for failing to exercise ordinary care in inspecting and repairing the Silverado; but the jury found no liability for Moore Chevrolet.

[4] In a supplemental judgment, the trial court also ordered Moore Pontiac and Morgan to pay $3,887.24 of the Scotts' costs.

4

The Scotts contend that the Court of Appeals erred in ruling that Moore Pontiac had no legal liability for the accident and the resulting injuries. We disagree.

It has long been the law in this Commonwealth that a vehicle's owner, such as a dealership, is not liable for injuries sustained by a third party during a test drive if the vehicle's owner or a representative of the owner, such as a salesperson, is not present in the vehicle during the test drive. On the other hand, a vehicle's owner may potentially be liable for injuries sustained by a third party if the owner or his or her representative is present during the test drive.[5] Our holdings on those issues appear to be in accord with the general rule in these types of cases.[6]

---

[5] *See, e.g.,* Wayne's Adm'x v. Woods, 275 Ky. 477, 121 S.W.2d 957 (1938) ("In Wilhelmi v. Berns, 274 Ky. 618, 119 S.W.2d 625, we held a dealer liable to a third person for injuries received where the car was being driven by a customer, accompanied by one of the dealer's salesmen. There, of course, it could with propriety be said that the car was actually within the control or custody of the salesman. The great weight of authority recognizes the liability of the dealer in such a situation. On the other hand, the authorities are unanimous, so far as we can discover, in holding that a dealer is not responsible, in the absence of a statute to the contrary, for injuries received by third persons where an automobile is loaned to a prospective purchaser, who is a competent driver, for trial. Clearly, the customer was acting for the dealer only in a restricted sense. It was not the purpose of the transaction to affect the dealer's relationship with third persons. Such benefit as might accrue to the dealer arose from the reactions of the customer himself, and not from dealings between the customer and third persons.") (citations omitted); Johnson-Kitchens Ford Corp. v. Shifflett, 462 S.W.2d 430, 432 (Ky. 1970).

[6] 61 C.J.S. *Motor Vehicles* § 858 (2008) ("The owner of a motor vehicle generally is not liable for the wrongful or negligent operation of the vehicle by a prospective purchaser, unless the owner or the owner's agent is present in the car . . . . As a general rule, where the owner of a motor vehicle or his or her agent is not present in the vehicle, the owner is not liable for the negligent or wrongful operation of the vehicle by a prospective purchaser. A prospective purchaser is usually regarded as a bailee of the vehicle, and not as an agent or servant of the owner or one engaged in a joint enterprise with the owner. However, liability may be imposed where the

5

The Scotts do not contest this settled rule of law. They actually concede the established Kentucky precedent regarding a dealer's liability for an accident occurring during a test drive.[7] But the Scotts contend that precedent is not pertinent because they argue that Moore Pontiac's liability arises from its own independent acts of negligence rather than being held vicariously liable for

---

owner or his or her agent is personally negligent, as in entrusting the vehicle to an incompetent driver or permitting the operation of a defective vehicle. Thus, a motor vehicle dealer is liable for damages resulting from an accident involving one of its vehicles if the dealer negligently entrusts the vehicle to an incompetent driver. However, the relationship of the dealer and the permissive driver or prospective purchaser, standing alone, is not sufficient to create vicarious liability.") (footnotes omitted); *see also* 8 Am.Jur.2d *Automobiles and Highway Traffic* § 625 (2008).

[7]  Although our precedent appears to be based upon the theory that a passenger may have some control over the operation of a vehicle, we recognize that, although distinguishable from the case at hand, at least one state appellate court has opined that "[i]t is unrealistic to hold, in the present day uses of motor vehicles when heavy traffic is the rule and not the exception, that the occupant of a motor vehicle has factually any control or right of control over the driving of the operator." Gaspard v. LeMaire, 158 So.2d 149, 154 (La. 1963). Although also distinguishable, another state court has held that the imputation of negligence to a passenger because of the driver's negligent conduct based upon a theory that the passenger had control over the vehicle is a "legal fiction . . . ." Watson v. Regional Transportation District, 762 P.2d 133, 138 (Colo. 1988).

Also, an argument could be made that holding an automobile dealer liable for injuries resulting from a test drive only where the dealer had an employee present during the test drive could serve as a disincentive for dealers to have an employee accompany prospective purchasers on test drives. Such a diminution in the number of dealer-accompanied test drives would not appear to have the socially desirable goal of furthering public safety, since implicit in the theory that a dealer should only be liable when it has a representative present is an assumption that test drivers will operate vehicles more carefully when a representative of the dealer is present (based upon the now-disputed belief that the dealer's representative would have at least some theoretical control over the test driver's operation of the vehicle).

So, in a proper case, we perhaps should re-examine our earlier holdings pinning liability on a car dealer or other vehicle owner for injuries occurring during a test drive only if a representative of the dealer or other vehicle owner is physically present in the car during the test drive. But we need not explore further that interesting issue in this opinion because the Scotts have not challenged our holdings in this area, many of which are based upon bailment doctrine.

Morgan's negligence. Toward that end, the Scotts present two theories under which they contend Moore Pontiac should be liable for their injuries. First, they contend that Moore Pontiac's actions (or inaction) cause it to be liable under our oft quoted statement in Grayson Fraternal Order of Eagles, Aerie No. 3738, Inc. v. Claywell that "every person owes a duty to every other person to exercise ordinary care in his activities to prevent foreseeable injury."[8] Certainly we agree with the principle espoused in that statement, but we disagree with the Scotts that its application leads to liability for Moore Pontiac.

First, Claywell is factually dissimilar to the case at hand because Claywell involved dram shop liability. And we later noted that much of our holding in Claywell might have been superseded by statute.[9] Second, and more importantly, our language in Claywell did not speak of creating new causes of action. Rather, our statement was an expression of the general principle that each member of the public owes the remainder of the public a duty to exercise reasonable care in his or her everyday affairs.

As the Court of Appeals has noted, Claywell is often invoked "by parties advocating a theory of liability or a cause of action where none previously existed and legal authority is otherwise lacking. Despite its use of the catch phrase 'universal duty of care,' the Grayson case itself demonstrates that the duty referred to is not without limits."[10] Indeed, we remain committed to the

---

[8]   736 S.W.2d 328, 332 (Ky. 1987).

[9]   DeStock No. 14, Inc. v. Logsdon, 993 S.W.2d 952, 955-58 (Ky. 1999).

[10]  James v. Wilson, 95 S.W.3d 875, 891 (Ky.App. 2002).

longstanding tort principle that liability based upon negligence is premised upon the traditional prerequisites, such as proximate cause and foreseeability.[11] Simply put, the concept of a universal duty of care is not so broad as to lead to a conclusion that a vehicle's owner has automatically breached a legal duty of care simply by permitting an apparently competent driver to take the owner's vehicle for a test drive. Or, in other words, a vehicle owner generally satisfies his or her duty of care in test-drive situations simply by determining before the test drive that the prospective purchaser and test driver is duly licensed and is otherwise not obviously impaired.[12] Since Moore Pontiac met its relatively low burden to ascertain that Morgan was not an incompetent driver, we reject the Scotts' claim that the unfortunate

---

[11] *See, e.g.,* Reece v. Dixie Warehouse and Cartage Co., 188 S.W.3d 440, 445 n.6 (Ky.App. 2006) ("It is well-established that to establish liability for negligence the plaintiff must prove: (1) a duty; (2) a breach of that duty; (3) which was the proximate cause of an injury; and (4) which resulted in damages. All of these elements are essential to a valid claim.").

[12] *See, e.g.,* 8 Am.Jur.2d *Automobiles and Highway Traffic* § 625 ("A motor vehicle dealer who places one of his or her vehicles in the hands of a prospective purchaser, or one acting for the latter, whom he or she knows, or in the exercise of reasonable care should know, to be incompetent to operate the vehicle safely is liable for injuries caused by the driver's incompetence. In general, unless there are facts and circumstances which might reasonably put the dealer on inquiry, he or she is not obliged to test the competency and skill of the customer before entrusting him or her with an instrumentality which, even though it may become highly dangerous by improper use and operation, is not inherently dangerous. . . . In the absence of knowledge to the contrary, the dealer may rely on the driver's license as evidence of the competency of the driver . . . .") (footnotes omitted); Rogers v. Wheeler, 864 S.W.2d 892, 896 (Ky. 1993) ("When Rogers let Daugherty take the vehicle off the lot to see if she wanted to purchase it, he had a duty to determine if she had a valid driver's license. K.R.S. 186.620 provides that no person shall authorize or knowingly permit a motor vehicle owned or controlled by him to be driven by any person who has no legal right to drive. *Cf.* 7 Am.Jur.2d *Automobiles and Highway Traffic* § 651 provides in part that a dealer who places one of his vehicles in the hands of a prospective purchaser who he knows or in the exercise of reasonable care should know is incompetent to operate the vehicle safely is liable for injuries caused by the driver's incompetence.").

circumstances of this case are so extraordinary as to hold Moore Pontiac liable for a purported breach of ordinary care to the Scotts.[13]

The Scotts' second and closely related theory of recovery is that Moore Pontiac assumed a duty of ordinary care to the Scotts. The gist of the Scotts' argument is that Moore assumed a duty of care toward the Scotts, and the rest of the public, by adopting and then failing to follow its own in-house rule requiring a Moore Pontiac employee to accompany Morgan on his test drive. We disagree.

We have previously adopted Restatement (Second) of Torts § 324A regarding the elements necessary for liability for the breach of a voluntarily assumed duty.[14] Under § 324A, "[o]ne who undertakes . . . to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if" the person's "failure to exercise reasonable care increases the risk of such harm," or if "the harm is suffered because of reliance of the other

---

[13] To the contrary, we find nothing extraordinary about the facts relied upon by the Scotts, such as the fact that it was slightly raining on the day of the accident; the fact that Morgan was in his early twenties (well above the legally permissible age to possess a drivers' license); the fact that Morgan's vehicle purportedly was an "old van"; nor the purported fact that the vehicle Morgan test drove was "fast" (the jury ruled against the Scotts on their claim that the truck was improperly maintained); nor the Scotts' assertion that the accident happened on an unduly dangerous roadway, of which Morgan should have been forewarned, because we agree with Moore Pontiac that it "cannot be held liable . . . for failing to prevent a test driver from driving on the same road [Candria Scott] deemed safe enough to travel."

[14] Ostendorf v. Clark Equipment Co., 122 S.W.3d 530, 538-39 (Ky. 2003).

or the third person upon the undertaking."[15] The Scotts cannot meet these criteria.

We agree with the Court of Appeals that the Scotts could not have reasonably relied upon Moore Pontiac's policy regarding having a salesperson accompany a test driver because the evidence showed that the Scotts were unaware of the policy's existence. After all, one cannot logically rely upon an unknown. And even if the Scotts had somehow divined the existence of Moore Pontiac's in-house policy before the accident, they have pointed to no evidence tending to prove that Candria Scott drove differently in reasonable reliance upon Moore Pontiac's internal policy.

We also agree with the Court of Appeals that Moore Pontiac's failure to observe its own in-house policy did not increase the risk of harm to Candria Scott. First, we reject any argument that a person or business entity's adoption of an internal guideline or policy and subsequent failure to follow that internal guideline automatically leads to liability under § 324A.[16] Second, we fail to see how Moore Pontiac's failure to abide by its own internal policy

---

[15] *Id.* at 538.

> We also reject the Scotts' claim under § 324A's other basis for liability, which is premised upon a voluntary undertaking "to perform a duty owed by the other to the third person . . . ." *Id.* The Scotts take great pains to point out that they are not seeking to hold Moore Pontiac vicariously liable for Morgan's negligence, meaning that they are not arguing that Moore Pontiac assumed Morgan's duty to operate the truck with due care during the test drive.

[16] *See, e.g.,* Murphy v. Second Street Corp., 48 S.W.3d 571, 575 n.16 (Ky.App. 2001) (holding that defendant's failure to follow its internal policy by filling out incident report after plaintiff was assaulted at nightclub "did not create a new duty or constitute an assumption of a duty that [defendant] otherwise did not have."); Angabooguk v. State, 26 P.3d 447, 452 (Alaska 2001) ("[party's] internal rules and guidelines do not create a duty of care for [party].").

increased the risk of harm to Candria. As the Court of Appeals noted, without the internal policy, Moore Pontiac could have "lent its cars to responsible drivers without making itself liable for the damages caused by their negligence. The existence and subsequent non-observance of the in-house rule did nothing to increase this risk. The situation is exactly what it would have been had Moore Pontiac not instituted the policy." And Morgan testified that he was going under the speed limit before the accident and, furthermore, that he drove more safely during the test drive because his family was with him than he would have driven had the salesperson alone accompanied him. Therefore, it is clear that Moore Pontiac's failure to observe its in-house policy was not the proximate cause of the Scotts' injuries, which is fatal to the Scotts' claims against Moore Pontiac.[17] We therefore affirm the Court of Appeals' conclusion that Moore Pontiac should have been granted a directed verdict dismissing the Scotts claims against it, and that the judgment against Moore Pontiac must be vacated.

B. <u>Because We Have Affirmed the Court of Appeals' Decision Regarding the Scotts' Appeal, Moore Pontiac's Appeal is Moot</u>.

Moore Pontiac filed a separate appeal, essentially arguing that the trial court committed reversible error by allowing the Scotts' counsel to make improper remarks about Moore Pontiac's financial condition during closing argument and that Moore Pontiac was entitled to a judgment as a matter of

---

[17] <u>Reece</u>, 188 S.W.3d at 445 n.6 (stating that to establish liability for negligence, plaintiff must prove the defendant's breach of duty was the proximate cause of the injury).

11

law. We have already affirmed the Court of Appeals' conclusion that Moore Pontiac should not have been held liable for the Scotts' damages. So Moore Pontiac's argument that it was entitled to judgment of a matter of law is moot. Likewise, although we shall address the propriety of the Scotts' counsel's closing argument during our discussion of Morgan's appeal, that issue is moot as to Moore Pontiac.

### C. We Affirm the Court of Appeals' Decision Regarding Morgan's Percentage of Liability

Morgan contends that the Court of Appeals erred by granting a petition for an extension of its opinion, and then extending its opinion to assign one hundred percent liability and damages against Morgan, despite the jury's finding that Morgan was only fifty percent responsible for the Scotts' injuries and resulting damages. We disagree and accordingly affirm the Court of Appeals determination.

In support of his argument that he should bear only fifty percent of the liability for the Scotts' injuries, Morgan relies primarily upon the decision of this Court in Prudential Life Insurance Company v. Moody, [18] a decision premised on KRS 454.040, the statute that allows juries to assess joint or several damages against multiple defendants.[19] We find Morgan's reliance

---

[18] 696 S.W.2d 503 (Ky. 1985)

[19] KRS 454.040 states: In actions of trespass the jury may assess joint or several damages against the defendants. When the jury finds several damages, the judgment shall be in favor of the plaintiff against each defendant for the several damages, without regard to the amount of damages claimed in the petition, and shall include a joint judgment for the costs.

12

upon Prudential Life to be misplaced because it contains a critical factual difference.

In Prudential Life, a jury determined that one party, Carney, was negligent and liable for the plaintiff's injuries, fixing his share of the fault at fifty percent. Carney, however, escaped responsibility for his negligence and the resulting liability because the statute of limitations had expired. He remained, both in fact and in law, "at fault" for the injury, but the running of the statute of limitations put his negligence beyond reach of the jury's verdict.[20] The remaining fifty percent of fault rested with the other tortfeasor. The causal connection between his negligent conduct and the damages did not increase simply because the plaintiff had waited too long to assert a claim against Carney.

In sharp contrast to Carney in Prudential Life, Moore Pontiac escapes liability because it did nothing to incur liability and, as a matter of law, its actions were not a proximate cause of the Scotts' injuries. The applicability of Prudential Life is further diminished because it was rendered three years before the enactment of KRS 411.182(1), which requires apportionment of fault "[i]n all tort actions . . . involving fault of more than one (1) party to the action . . . ." Here, there is not "more than one party" at fault. Morgan is the only party at fault. Only Morgan breached a duty and only Morgan caused an injury. In Prudential Life, Carney was at fault but avoided liability because the

_____

[20] Prudential Life Insurance, 696 S.W.2d at 509.

13

statute of limitations had expired.[21] Here, Moore Pontiac avoids liability for the simple reason that it did nothing that legally or proximately caused the injuries.

Our decision in <u>Owens Corning Fiberglas Corp v. Parrish</u>, is more to the point:

> [F]ault may not be properly allocated to a party, a dismissed party or settling nonparty unless the court or the jury first find that the party was at fault; otherwise, the party has no fault to allocate. KRS 411.182; <u>Floyd v. Carlisle Construction Co., Inc.</u>, 758 S.W.2d 430, 432 (Ky.1988) "If there is an active assertion of a claim against joint tortfeasors and *the evidence is sufficient to submit the issue of liability to each,* an apportionment instruction is required whether or not each of the tortfeasors is a party-defendant at the time of the trial." <u>Id.</u> (emphasis added). The mere fact that a party has been sued or has settled does not permit the factfinder to allocate part of the total fault to that party.[22]

What rings clear from <u>Owens Corning</u> is that fault may be apportioned only among those against whom the evidence of liability was sufficient to allow submission of the issue of fault to the jury. The inability of Morgan or the Scotts to present sufficient evidence of fault on the part of Moore Pontiac eliminated any proper allocation of fault to Moore Pontiac. The jury should not have been instructed on apportionment because Morgan was the only party liable. When, under the evidence, only one party is shown to have caused an injury, fault and its resulting liability cannot legally or rationally be apportioned elsewhere. This concept was also expressed by the decision of the Court of Appeals in <u>Jenkins v. Best</u>, in which the appellant claimed the right as

---

[21] *Id.*

[22] 58 S.W.3d 467, 472 (Ky. 2001).

14

a defendant in a tort action to appeal the dismissal of his co-defendant in order to preserve the possibility of an apportionment instruction.[23] The Court of Appeals noted that, while this right does exist, *"it does not give a party the right to apportion fault to persons whose liability has been judicially determined not to exist."* [24] Moore Pontiac's liability has been judicially determined not to exist. There should have been no apportionment.

Morgan emphasizes that our decision in <u>Hilen v. Hayes,</u> [25] echoed by the enactment of KRS 411.182, firmly established the concept that it is fundamentally unfair to burden any party with more liability than his share of the fault would justify. We agree, but we can find nothing fundamentally unfair about assigning one hundred percent of the fault for an injury to the only party that breached a duty and caused the injury.

Morgan argues that the Court of Appeals committed a procedural error by granting the Scotts' request for extension of its opinion regarding issues that were not properly preserved for appellate review. The initial opinion of the Court of Appeals simply reversed the trial court's judgment regarding the liability of Moore Pontiac and affirmed as to Morgan. Later, the Court of Appeals granted the Scotts' motion for an extension of that original opinion and then issued a revised opinion which added a provision remanding the matter to

---

[23] 250 S.W.3d 680, 686 (Ky. App. 2007)

[24] *Id.* (Emphasis added.)

[25] 673 S.W.2d 713 (Ky. 1984) (supplanting the doctrine of contributory negligence was supplanted with comparative fault).

15

the trial court for entry of a judgment against Morgan for all of the damages determined by the jury.

The proper means of preserving the issue, Morgan contends, would have been for the Scotts to have filed a protective cross-appeal. We agree that new issues cannot properly be raised in a petition for rehearing, but we do not see this matter as having raised a new issue, nor do we see how adding a cross-appeal to an already complex procedural appellate process would be necessary to address this matter. [26] The Court of Appeals' initial conclusion that Moore Pontiac's actions were not, as a matter of law, a proximate cause of the Scotts' damages left Morgan as the only party whose fault caused the injury and therefore, *ipso facto*, he was one hundred percent at fault. Correcting of the trial court's judgment to reflect what the law and the evidence had clearly established was simply the natural aftermath of the Court of Appeals' original opinion. The Court of Appeals' decision to extend the Opinion to provide guidance to the trial court in correcting the judgment was well within its purview under Civil Rule 76.32.

D. We Find No Error in Other Issues Raised by Morgan.

Morgan raises seven somewhat interrelated issues in his separate appeal. We review them below, but find no error to warrant reversal.

---

[26] *See, e.g.,* Commonwealth, Department of Highways v. Thomas, 427 S.W.2d 213, 218 (Ky. 1967) (refusing to consider issue raised for first time in petition for rehearing).

1. <u>The Trial Court's Failure to Pre-Screen Segments of Videotaped Deposition Testimony Played for the Jury During Closing Argument was a Harmless Error.</u>

Morgan contends that the trial court erred by permitting portions of a physician's videotaped deposition testimony to be displayed to the jury during closing argument without first conducting a hearing.[27] Although we urge trial courts to conduct hearings before exposing such matters to the jury, we decline to hold that the lack of a hearing is, standing alone, reversible error.

We agree with a previous ruling of the Court of Appeals that there is no blanket prohibition against counsel playing selected portions of a videotaped deposition for a jury during closing argument.[28] But our opinion should not be misconstrued as holding that a trial court must invariably permit such segments to be displayed to the jury during closing argument.[29] Instead, we

---

[27] Although the videotaped record of the trial does not clearly show the video screen upon which the jury viewed the segments, we estimate that the total length of the segments played to the jury was approximately three minutes.

[28] <u>Owensboro Mercy Health System v. Payne</u>, 24 S.W.3d 675, 678-79 (Ky.App. 2000), *citing* <u>Condella v. Cumberland Farms, Inc.</u>, 689 A.2d 872, 875 (N.J. Super.Ct. Law Div. 1996).

Obviously, since closing argument is not evidence, <u>Dixon v. Commonwealth</u>, 263 S.W.3d 583, 593 (Ky. 2008), and counsel should not seek to introduce new evidence during closing argument, then counsel may present to the jury during closing argument only portions of recorded testimony that have already been entered into evidence.

[29] <u>Condella</u>, 689 A.2d at 875 ("Although in the case at bar the review of the videotape was not lengthy, this procedure could result in long delays between closing arguments which could impair the orderly and efficient administration of the jury process. The court should have discretion to deny or limit the application to show portions of the videotape testimony if the time necessary to review the testimony would unduly delay plaintiff's closing, and thereby prejudice defendant, as plaintiff's closing would be substantially fresher in the jury's mind at the time they deliberate.") (citations omitted).

17

hold only that the trial courts of the Commonwealth have discretion to permit, or to refuse, the re-playing of videotape segments in closing argument.[30]

If a trial court exercises its discretion to permit the usage of segments of videotapes during closing argument, we emphasize that the trial judges must scrupulously control their playing by ensuring that the segments presented to the jury are not overly lengthy, do not overly emphasize one party's case, and are not a misrepresentation of the witness' testimony.[31] We also agree with a New Jersey court's wise pronouncement that a trial court

> should give a cautionary instruction, preferably at the time the video is played during summation . . . . The judge should inform the jury that attorneys are permitted to show the video to assist in displaying what they consider significant testimony, but it is the jury's function and obligation to determine the facts based on its recollection of all of the evidence, including both direct and cross-examination of all witnesses, and jurors should not place any extra emphasis on portions of testimony played back.[32]

Moreover, if a trial court permits video segments to be played to a jury during closing argument, we agree with another New Jersey court's holding that a trial court "out of the jury's presence, should therefore view the proposed

---

[30] State v. Muhammad, 820 A.2d 70, 82 (N.J. Super. Ct. App. Div. 2003) ("Trial judges have broad discretion in setting the permissible boundaries of summations. They may permit some or all of the proposed video playbacks, or they may reject their use entirely. The determination is guided in each case by balancing the benefit to the proponent against the possible prejudice to the opposing party. Rejection may also be based on undue consumption of time, inability to avoid delay between summations, potential to confuse or mislead the jury, or any other appropriate consideration. Special caution should be exercised to avoid playback of testimony of an inflammatory nature.").

[31] Condella, 689 A.2d at 875.

[32] Muhammad, 820 A.2d at 82. Since Morgan does not argue about the lack of a cautionary instruction to the jury in this case regarding the video snippets played during closing argument, we shall not consider whether the trial court's failure to caution the jury was erroneous.

18

portions of the videotape testimony in open court on the record to make sure that it accurately reflects the evidence."[33] This prophylactic hearing should ensure that the trial court exercises proper control over counsel's proposed use of snippets of video testimony during closing argument, thereby best ensuring that closing argument does not devolve into a contest to determine which side employed the best videographers or editors.[34]

Although there was discussion in this case between the trial court and counsel on this issue, all parties seem to agree that the trial court did not personally view the snippets the Scotts' counsel planned to use during closing argument before permitting counsel to display those video snippets to the jury. The trial court's failure to view the snippets before permitting counsel to display them to the jury was an error. Since we are constrained to "disregard any error or defect in the proceeding which does not affect the substantial rights of the parties[,]"[35] we must now determine whether that error was harmless.

Morgan does not contend that the video snippets played to the jury during the Scotts' closing arguments contained any substantive problems (such as being too lengthy or misrepresenting the doctor's complete testimony). Instead, Morgan's sole argument on this issue is that the trial court committed reversible error by failing to view the snippets before allowing the Scotts'

---

[33] Condella, 689 A.2d at 875 (emphasis added).

[34] Muhammad, 820 A.2d at 81 ("A trial may not be reduced to a battle of highlight films.").

[35] Kentucky Rules of Civil Procedure (CR) 61.01.

counsel to display them to the jury. In the absence of even an allegation of substantive prejudice to Morgan from the contents of the snippets played to the jury, we conclude that the trial court's procedural failure to screen the snippets for itself before permitting them to be played for the jury was a harmless error.

2. The Trial Court Did Not Err by Permitting the Scotts' Counsel to Play Edited Portions of Video Depositions During Trial.

During the Scotts' case in chief, the Scotts' counsel played for the jury selected portions of several videotaped depositions. Morgan argues that the trial court erred by permitting the Scotts' counsel to play only selected portions of those videotaped depositions. We disagree.

CR 32.01 specifically permits a party to play "any part or all of a deposition . . . ." So there was nothing inherently improper about the Scotts' counsel's decision to play only selected portions of these depositions. If Morgan desired the remainder of the deposition(s) to be played for the jury, he could have either required the Scotts to present the remainder of the deposition(s) to the jury or he could have done so himself.[36] But Morgan did not avail himself of either option. In these types of situations, we agree with the Court of Appeals' earlier holding that a trial court is not required to mandate on its own motion that additional portions of an edited videotaped deposition be displayed to the jury.[37]

---

[36] *See* CR 32.01(d) ("If only part of a deposition is offered in evidence by a party, an adverse party may require him to introduce any other part which ought in fairness to be considered with the part introduced, and any party may introduce any other parts.").

[37] Davenport v. Ephraim McDowell Memorial Hospital, Inc., 769 S.W.2d 56, 61 (Ky.App. 1988) ("CR 32.01 permits the reading of a portion of a deposition, and

20

Moreover, Morgan does not contest the Scotts' assertion that he refused their offer during trial to introduce the entirety of at least one of the video depositions in question. And because of the objection of another defendant, the trial court admonished the jury that the deposition(s) had been edited.

The only authority cited by Morgan is CR 30.02, which generally governs depositions; but nothing in that general rule contravenes CR 32.01's clear and specific allowance of the usage of edited videotaped depositions at trial. Finally, we reject Morgan's argument that he was unable to object properly at trial because the Scotts did not give him adequate notice of their intent to use the edited videotapes during trial. There is no notice requirement in CR 32.01. And it is undisputed that the Scotts' counsel provided all parties and the trial court with an index describing the video testimony to be presented at trial and referencing the location of that testimony in the stenographic transcript. So we agree with the Court of Appeals that "Morgan had at his disposal the means to specifically identify and locate the portions of the video testimony being presented in order to determine whether additional portions of the testimony would assist the jury in understanding his theory of the case."

We note that although Morgan contends that he had no time to object to the editing done by the Scotts, he still, despite plenty of time for research and

subpart (d) of the rule allows the opposing party the opportunity to require any other parts to be introduced for the sake of fairness. The right to require such additional portions to be introduced belongs to opposing counsel, and it is their responsibility to avail themselves to the right. Absent a call upon the court to observe CR 32.01(d), the party who makes the initial offering of a portion of a deposition should not be hindered by a *sua sponte* ruling to put so much as one more word into evidence.").

21

reflection, has not shown us how the editing distorted or otherwise improperly condensed the depositions in question.[38] In sum, although we encourage parties to provide as much notice as possible to the trial court and opposing counsel of their intention to use portions of video depositions during trial, we do not find that the trial court erred by permitting the Scotts' counsel to play selected portions of certain depositions in this case.

3. The Scotts' Counsel's Reference to Morgan's Financial Status During Closing Argument Does Not Necessitate a New Trial.

During his closing argument, the Scotts' attorney stated that Moore Pontiac had not sued Morgan for the damage done to its vehicle because it either believed Morgan had done nothing wrong or Moore Pontiac did not think it would "get a dime out of" Morgan. Although not stated by Morgan, no contemporaneous objection was made to that comment. Counsel later stated that the apportionment instruction was important because it was the "ultimate instruction that determines whether or not Candy [Candria Scott] really gets anything." Again, although not mentioned by Morgan, no contemporaneous objection was made to this statement. Shortly thereafter, the Scotts' counsel argued that if the jury found Morgan 100 percent liable, the Scotts would get "the same case against him [Morgan], and judgment against him [Morgan] as they [Moore Pontiac] would have had had they filed suit against him [Morgan]

---

[38] We note that even in his brief before the Court of Appeals, Morgan merely stated, "[t]here may have been testimony in these depositions that was objectionable and should have been removed . . . ."

for the truck." A contemporaneous objection was made to that statement,[39] along with a motion for mistrial; but the trial court denied any relief.

Many decades ago, our predecessor court eloquently noted that "[t]here is no law applicable to the poor that is not likewise applicable to the rich, nor is any law applicable to the rich that is not likewise applicable to the poor," meaning that "an endeavor on the part of an attorney or litigant to inflame the minds of the jury by referring to the financial status of either of the parties is improper."[40] We agree with the wisdom of our predecessor court's statement on this subject and remind counsel that reference to the financial condition of a party to a civil action is generally improper.

The statements at issue patently refer to Morgan's poverty and, by inference, Moore Pontiac's deep financial pockets. We agree with the Scotts that counsel is permitted to inform the jury of the legal effect of apportionment of liability,[41] but the statements in question go further to imply or directly state that Morgan was virtually penniless. And Morgan's counsel's quite unusual decision to argue in closing to the jury that his client, not Moore Pontiac, should be found primarily responsible for the Scotts' injuries was not linked to

---

[39] Although the angle of the videotaped record is unclear, it is possible that counsel for Moore Pontiac was the principal speaker at the bench conference.

[40] Walden v. Jones, 289 Ky. 395, 158 S.W.2d 609, 612 (1942). See also, e.g., Jones v. City of Bowling Green, 354 S.W.2d 749, 751 (Ky. 1962) ("an endeavor on the part of an attorney to influence the minds of the jurors by referring to the financial effect of the verdict on either party is improper, although the reference may not necessarily be prejudicial.").

[41] Young v. J.B. Hunt Transportation, Inc., 781 S.W.2d 503, 507 (Ky. 1989) ("The best way to safeguard litigants' rights to a fair verdict is to allow counsel to inform the jury of the legal effect of apportionment of liability and argue the significance of such determination in the context of the overall result.").

the relative financial status of Moore Pontiac and Morgan and, thus, did not open the door for the Scotts' counsel to refer repeatedly to Morgan's penury.[42] So we conclude that the Scotts' counsel's statements here were improper commentary upon Morgan's purported financial status.

The question then becomes whether those improper statements were prejudicial or were harmless errors under CR 61.01. Indeed, our predecessor court even explicitly noted that reference to a party's financial status by counsel is "not always prejudicial . . . ."[43] Our analysis of this issue is complicated by the fact that a timely objection was made only to one of the statements at issue.

We note that Morgan does not contest that a witness for Moore Pontiac had already referred to Morgan's insurance status, without objection from Morgan. During the bench conference regarding the objection to the Scotts' counsel's reference to Morgan's purported lack of wealth, the trial court specifically and correctly based its denial of relief, at least in part, on the fact that this insurance-related testimony already had been presented to the jury. We conclude that the earlier improper insinuation into the trial of insurance should have lessened the harmful effects of the Scotts' counsel's improper reference to Morgan's financial status.

---

[42] We construe Morgan's counsel's passing reference in closing argument to Morgan's "broad enough shoulders" to be a statement that Morgan was prepared to accept the jury's ultimate verdict, not a veiled attempt to inject Morgan's financial status into the proceedings.

[43] Walden, 158 S.W.2d at 612.

Most important, however, is the lack of demonstrable prejudice to Morgan stemming from the comments at issue. All that Morgan's counsel essentially relies upon to establish prejudice is the fact that the jury's verdict was large but not unanimous. First, it would be sheer speculation to find that jurors were coerced into returning a verdict against Morgan because of his purported lack of deep pockets. Next, Morgan's argument to the contrary notwithstanding, it defies logic to presume that a jury inexplicably increased its verdict against Morgan (or increased the percentage of fault it ultimately assigned to Morgan) because counsel for the Scotts improperly referred to Morgan's ostensible lack of wealth. Prejudice in this area would be far more apparent if, as would be more typical, counsel had contended that Morgan was blessed with an abundance of financial resources.

On balance, we conclude that the improper comments did not adversely prejudice Morgan's substantial rights. So we conclude that the comments were harmless errors.

4. <u>The Trial Court Did Not Err By Refusing to Give an Instruction Regarding Candria's Alleged Failure to Mitigate Her Damages</u>.

Morgan contends that the trial court committed reversible error by failing to instruct the jury regarding Candria Scott's purported failure to mitigate her damages by failing to follow all of her physician's treatment advice. We disagree.

25

Under Kentucky law, a party is required to mitigate his or her damages.[44] So if a party introduces evidence that another party has failed properly to mitigate his or her damages, the jury should be given a failure-to-mitigate-damages instruction.[45] A trial court's failure properly to instruct a jury is presumptively prejudicial.[46] So the question becomes whether there was sufficient specific evidence introduced to support a mitigation of damages instruction. Like the Court of Appeals, we find that there was not.

Under Kentucky law, a tortfeasor "takes the claimant as he finds him and is entitled to neither credit nor setoff against the amount of the claimant's damages because of preexisting physical conditions which make the claimant more susceptible to injury, or to greater injury, than would have been the case with better health."[47] Candria was obese and a smoker at the time of the accident. Morgan contends that Candria's failure to lose weight and to stop

---

[44] *See, e.g.,* Davis v. Fischer Single Family Homes, Ltd., 231 S.W.3d 767, 780 (Ky.App. 2007) ("It is well-settled in this Commonwealth that a party must mitigate his damages."); Equitable Life Assurance Society of United States v. Merlock, 253 Ky. 189, 69 S.W.2d 12, 15 (1934) ("It is a rule of general application that where a plaintiff sustains damage by reason of an injury or disease, it is his duty to minimize his damage.").

[45] Clark v. Hauck Manufacturing Co., 910 S.W.2d 247, 251 (Ky. 1995) (holding that it is a "basic tenet of Kentucky law" that "a party is entitled to a jury instruction in every duty supported by the facts entered into by the evidence, whether that duty is a common law duty or a statutory duty."); Farrington Motors, Inc. v. Fidelity & Cas. Co. of New York, 303 S.W.2d 319, 321 (Ky. 1957) ("Each party to an action is entitled to an instruction upon his theory of the case if there is evidence to sustain it.").

[46] McKinney v. Heisel, 947 S.W.2d 32, 35 (Ky. 1997) ("In this jurisdiction it is a rule of longstanding and frequent repetition that erroneous instructions to the jury are presumed to be prejudicial; that an appellee claiming harmless error bears the burden of showing affirmatively that no prejudice resulted from the error.").

[47] Wemyss v. Coleman, 729 S.W.2d 174, 178 (Ky. 1987).

smoking entitled him to an instruction regarding Candria's alleged failure to mitigate her damages.

Morgan would only have been entitled to a failure to mitigate instruction relating to Candria's failure to lose weight and stop smoking after the accident if he had offered specific evidence showing that her continued smoking and obesity had caused a worsening of her condition attributable to her failure to follow reasonable medical advice. But Morgan did not adduce the requisite specific testimony. In fact, Dr. Akers specifically testified that Candria's weight did not cause her femur to fail to heal. Also, Dr. Hegg only testified generally that the use of tobacco negatively affects healing of fractures and that Candria had been advised to stop using tobacco; but he did not know whether Candria had stopped using tobacco and was not specifically asked (and, thus, did not specifically testify) whether Candria's tobacco use specifically retarded the healing of her fractured femur. Such general testimony is insufficient to mandate a jury instruction regarding a plaintiff's failure to mitigate damages.[48] As the Court of Appeals aptly noted, "[w]hile there was some testimony that excess weight and smoking *may* contribute to the failure of bone fractures to properly heal, nothing in the expert testimony directly connects any complications in the healing process to these factors . . . ."

---

[48] *Cf.* <u>Proven Products Sales and Service v. Crutcher</u>, 464 S.W.2d 800, 802 (Ky. 1971) (holding in workers' compensation case that claimant's failure to follow general admonition to lose weight was not sufficient to cause reduction in benefits).

Because there was no evidence that Candria's failure to lose weight and stop smoking caused her femur to fail to heal, Morgan is not entitled to a mitigation of damages instruction related to Candria's obesity and smoking.[49]

Morgan further contends that he was entitled to an instruction relating to failure to mitigate damages because of Candria's alleged failure properly to use a bone stimulator prescribed by a physician to help heal her fractured femur. Dr. Hegg testified that his partner, Dr. Tau, had prescribed an electrical stimulator but that a log showed that Candria had used the bone stimulator only half the prescribed time. But Dr. Hegg did not testify that Candria's alleged failure to use the bone stimulator impeded the healing of her fractured femur.[50] So we agree with the Court of Appeals that there is a "lack of direct testimony to support a mitigation instruction."

5. We Cannot Say as a Matter of Law that the Verdict was Excessive.

Morgan contends that there was no evidence to support the jury's approximately $4 million verdict (half of which was improperly apportioned to Moore Pontiac). Morgan concedes that the Scotts were entitled to some sort of

---

[49] *See generally* 22 Am.Jur.2d *Damages* § 367 (2008) ("The doctrine of avoidable consequences may not be invoked as the basis for a hypercritical examination of the conduct of the injured party. The duty to mitigate is not absolute; recovery is diminished only to the extent that the plaintiff fails to mitigate the damages as they would be mitigated by an ordinary, reasonable person under similar circumstances. One need not take the best of all possible care of one's injuries, or employ the means best adapted to cure such injuries.") (footnotes omitted).

[50] Dr. Hegg was asked if he would "agree that this stimulator was something that she needed to use all the time . . . as prescribed?" Dr. Hegg's response was simply that "[i]f you are going to try and do it, it doesn't tend to work unless you use it." That vague, somewhat nonresponsive answer is not a specific statement or conclusion that Candria's failure fully to use the stimulator caused her femur to fail to heal timely.

28

recovery but argues the jury's verdict was excessive because "there was no evidence of excessive speed, impairment, intoxication or other factor[s] involving Morgan's operation of the vehicle that would have caused the jury to have awarded a verdict of this magnitude had Morgan been tried alone." Morgan contends that the jury returned such a large verdict because of the Scotts' counsel's improper remarks at closing regarding the parties' financial status. So Morgan contends that the trial court erred by denying his CR 59.01 motion for a new trial. We disagree.

Since "a proper ruling on a motion for new trial depends to a great extent upon factors which may not readily appear in an appellate record[,]" we may not disturb a trial court's decision to deny a motion for a new trial unless that decision is "clearly erroneous."[51] As an appellate court, our task is to "review the record and decide whether, when viewed from a standpoint 'most favorable' to the prevailing party, there is evidence to support the verdict and judgment."[52]

In the light most favorable to the Scotts, Candria suffered the immediate trauma of the accident, has a left femur that may never heal properly, has undergone multiple surgeries to attempt to heal her injuries, and may undergo more surgical procedures in the future. After the accident, Candria's mobility was limited; and she is more dependent upon her husband for help.

---

[51] Miller v. Swift, 42 S.W.3d 599, 601 (Ky. 2001).

[52] Davis v. Graviss, 672 S.W.2d 928, 933 (Ky. 1984). Davis was overruled on other grounds by Sand Hill Energy, Inc. v. Ford Motor Co., Ky., 83 S.W.3d 483, 493-95 (2002). Sand Hill was later vacated by Ford Motor Co. v. Estate of Smith, 538 U.S. 1028 (2003).

Additionally, the jury awarded Candria less than the maximum amount she had sought for future medical services, past mental and physical suffering, and future mental and physical suffering. Furthermore, the jury awarded Candria nothing on her claim for permanent impairment of her power to earn money in the future. Finally, the jury awarded James less than he sought on his claim for loss of services and conjugal relations with Candria. Moreover, Morgan has not shown that Candria's medical expenses were unreasonable or inflated. To the contrary, Morgan's own brief provides that "[t]here was no dispute that Ms. Scott received serious orthopedic injuries that had required surgical intervention." On balance, therefore, we, like the Court of Appeals, cannot say that the trial court's refusal to set aside the verdict as excessive was clearly erroneous.

Morgan expresses understandable concern that the jury's fact finding with respect to damages may have been influenced by the apparent availability of the deeper pockets of Moore Pontiac, and his own apparent lack of significant resources. We have maintained in Kentucky a long-standing doctrine that the jury's finding on liability is independent of its finding on the amount of damages.[53] KRS 411.182 maintains that doctrine by requiring that juries make their finding as to fault and damages in separate interrogatory instructions. It is presumed that the jury will follow the instructions issued to

---

[53] See Sand Hill Energy, Inc. v. Smith, 142 S.W.3d 153, 156 (Ky. 2004); Scuddy Mining Co. v. Couch, 295 S.W.2d 553, 554 (Ky. 1956).

30

it by the trial court.[54] As stated above, in Part D[3] of this opinion, it would be sheer speculation to presume that the jury's assessment of damages was improperly influenced by the apparently disparate wealth of Morgan and Moore Pontiac.

6. The Trial Court Did Not Err in Granting a Directed Verdict as to Candria Scott's Past Medical Expenses.

At the close of proof, the trial court granted a directed verdict of $274,339.28 on Candria Scott's past medical expenses claim. Morgan contends the trial court erred by granting the directed verdict. We disagree.

"Generally, a trial judge cannot enter a directed verdict unless there is a complete absence of proof on a material issue or if no disputed issues of fact exist upon which reasonable minds could differ."[55] In the case at hand, however, Morgan has not presented evidence to show that Candria's past medical expenses were improper, unreasonable, or not attributable to the injuries she sustained in her collision with Morgan. So there was no disputed issue of fact, nor any question on this issue, as to which reasonable minds could differ.

We agree with Morgan that the jury decides whether a plaintiff's past medical bills were reasonable and stemmed from the injuries underlying the

---

[54] Johnson v. Commonwealth, 105 S.W.3d 430, 436 (Ky. 2003) (quoting Scobee v. Donahue, 291 Ky. 374, 164 S.W.2d 947, 949 (1942) ("It is to be assumed that the jury ... followed the evidence and instructions in their entirety."); United States v. Davis, 306 F.3d 398, 416 (6th Cir. 2002)("Juries are presumed to follow the instructions they are given.").

[55] Bierman v. Klapheke, 967 S.W.2d 16, 18-19 (Ky. 1998).

cause of action.[56]  So a trial court should exercise great caution before granting a directed verdict on those issues.  But, under the facts of this case, the trial court did not err by refusing to submit the matter of Candria's past medical expenses to the jury.

The question regarding the propriety of medical bills does not become a matter for the jury's resolution if there is nothing in the record tending to show a dispute about the amount of those bills or their relationship to the alleged injuries underlying the action.  For example, in Jones, heavily relied upon by Morgan, the evidence showed that the plaintiff did not claim to be hurt and to seek medical attention for about two weeks after the accident.[57]  In fact, the plaintiff had called an attorney before she had even called a physician.[58]  And a physician testified that he found no damage attributable to the underlying trauma.[59]  So there was a question for the jury as to whether the plaintiff's medical expenses were reasonable and connected to the underlying accident.

Likewise, Carlson v. McElroy,[60] the other case relied upon by Morgan for the proposition that a jury is not required to believe the plaintiff or her physician on the issue of her injuries, is similar to Jones and distinguishable from the case at hand.  In Carlson, there was evidence that the plaintiff had

---

[56]  See, e.g., Jones v. Mathis, 329 S.W.2d 55, 56-57 (Ky. 1959).

[57]  Id. at 57.

[58]  Id.

[59]  Id.

[60]  584 S.W.2d 754 (Ky.App. 1979).

pre-existing medical problems and had been involved in other accidents.[61] Thus, the jury was required to determine the reasonableness of plaintiff's medical expenses in light of the evidence about the underlying accident and, furthermore, to determine whether those medical expenses stemmed from the underlying accident.[62] None of those factors is present in the case at hand. Finally, Morgan's theory that the jury might have awarded a lesser amount to Candria for her past medical expenses because they awarded her less than the amount she sought for her future medical expenses is sheer speculation.

Since there was no issue upon which reasonable minds could differ regarding Candria's past medical expenses, the trial court did not err by granting a directed verdict on that issue.

7. The Trial Court Did Not Abuse its Discretion by Refusing to Lower the Interest Rate on the Judgment.

Interest on judgments is governed by KRS 360.040, which provides in relevant part that "[a] judgment shall bear twelve percent (12%) interest compounded annually from its date. . . . [S]uch judgment may bear less interest than twelve percent (12%) if the court rendering such judgment, after a hearing on that question, is satisfied that the rate of interest should be less than twelve percent (12%)." Morgan contends that the trial court erred by not reducing the interest rate below twelve percent. We disagree.

Morgan's sole argument is that the interest rate should have been lowered because evidence of the current market rates demonstrated that a

---

[61] *Id.* at 756.

[62] *Id.*

lower interest rate was appropriate. But the fact that a trial court could have chosen to impose a lower interest rate does not necessarily mean that its decision to impose a higher rate was an abuse of discretion.[63] Moreover, the fact that a twelve percent interest rate in today's economic climate may be well above the marketplace norm is a matter properly to be considered by the General Assembly because that body has the power and discretion to lower the de facto legal interest rate contained in KRS 360.040. In short, Morgan has pointed to nothing to cause us to conclude that the trial court's decision to impose the current de facto rate set forth in KRS 360.040 was an abuse of discretion.

## IV. CONCLUSION.

For reason's set forth above, the decision of the Court of Appeals is affirmed. This matter is remanded to the trial court for proceedings consistent with this opinion.

All sitting. Schroder, Scott, Venters, JJ., concur. Minton, C.J., concurs in result only. Abramson, J., concurs in part and dissents in part by separate opinion, Cunningham, J., joins. Noble, J., concurs in part and dissents in part by separate opinion.

ABRAMSON, JUSTICE, CONCURRING IN PART AND DISSENTING IN PART: While I agree with the majority's conclusion that Moore Pontiac had no liability as a matter of law, I disagree with the concept that Morgan should now

---

[63] *See* Owensboro Mercy Health System, 24 S.W.3d at 679 (applying abuse of discretion standard to trial court's decision regarding proper interest rate on judgment).

owe 100% of the damage verdict. In this case the jury was instructed in assessing fault to "consider both the nature of the conduct of each party and the extent to which the conduct of each was a factor in causing the injuries complained of." This language from Instruction No. 8 does not follow the apportionment statute which requires the fact finder to consider "both the nature of the conduct of each party at fault and the extent of the causal relation between the conduct and the damages claimed." KRS 411.182 (2). However, either formulation of the instruction (and certainly the one that tracks the language of the statute is preferable) results in an integrated verdict where the jury is encouraged, indeed directed, to consider how each party's conduct relates to the injuries or damages. Significantly, KRS 411.182 (1) (a) provides that the fact finder shall indicate "the amount of damages each claimant would be entitled to recover if *contributory* fault is disregarded..." (Emphasis supplied). There is no statutory directive for the jury to disregard comparative fault in assessing damages and, again, subsection (2) quoted above actually directs the jury to consider the interrelationship of damages and each party's fault.

While in theory damages are determined without regard to who is being held responsible, in fact jurors are often affected by the identity of the defendant(s). Some items of damages, such as medical expenses, may be circumscribed by objective evidence but less well-defined types of damages, such as pain and suffering, are particularly susceptible to variance based on the presence or absence of "deep pockets." In any given case, leaving the

plaintiff with a partial verdict may be unfair to the plaintiff, but granting him the whole verdict reapportioned only against the legally liable parties as discussed by Justice Venters in his majority opinion may be unfair to the remaining defendant(s). In my view, if a party to whom some fault has been apportioned is subsequently found to have no liability as a matter of law, the appropriate course is to remand the case for a new trial on damages only, with the jury directed to determine damages under the aforementioned statutory standards to be recovered from those parties who are in fact legally liable. Thus, I would remand this case for a damages trial as to Timothy Morgan. For this reason, I respectfully concur in part and dissent in part.

Cunningham, J., joins.

NOBLE, JUSTICE, CONCURRING IN PART AND DISSENTING IN PART: I concur with Justice Venter's opinion as to the law on apportionment. On the question of whether the entire liability for the Scotts' damages should rest on the sole remaining tortfeasor, Morgan, if Moore Pontiac was never rightfully a party, then it can have no liability, and whatever damages the jury found must be assessed against the only party who does. If Morgan caused all of the damages, he cannot avoid a portion of them just because an improper apportionment instruction was given. I also agree with the majority opinion on the other issues in this case.

However, I cannot say that Moore Pontiac has no duty of any kind in this case. While I may not have agreed with the jury's findings, whether Moore Pontiac had undertaken a duty by establishing a policy for their benefit and for

36

the benefit of customers and persons on the highway that increased the risk of harm to Scott when it did not follow its own policy was in fact a question for the jury. As car salesmen, Moore Pontiac is in a superior position to know the risks attendant to allowing potential customers to test drive its vehicles, and it has a great interest in determining which areas of the highway are safe for the test drive. In fact, Moore Pontiac publicly claimed this duty by posting its policy requiring a salesman to accompany a test driver prominently, by having an approved test drive route, and by requiring test drivers to show their driver's license.

At first thought, one might say that the absence of a salesman did not cause the wreck—Morgan's poor driving did. But Moore Pontiac was well aware that a salesman accompanying a test driver would have steered the driver to the approved route, could have cautioned the driver about inappropriate speed, or even could have required the driver to return to the lot if the driver's skill was questionable. Instead, according to his own testimony, Morgan ended up on an unapproved and curvy road, where he took a curve too fast and lost control of the vehicle. The salesman's absence thus could have been argued to increase the risk because the safeguards he would bring were not in place.

There was a dispute in the evidence whether any salesman accompanied Morgan on either of his two test drives: The salesman claimed he went on the first test drive, and Morgan claimed he did not. The jury was free to believe

either man's testimony. Moore Pontiac's policy was either violated once or twice that day.

Additionally, part of the reason Moore Pontiac created its test drive policy and thus assumed a duty was that its own insurance company required such a policy as a condition of insuring Moore Pontiac. Obviously, the insurance came from a superior position of knowledge as to the incidence of risk during test drives and had a clear opinion about what would decrease that risk. Moore Pontiac, in the business of selling cars, benefits directly from allowing potential customers to test drive their vehicles. They have insured against the risks attendant to such a practice. Such a business should not be allowed, as a matter of public policy, to benefit from an activity without taking reasonable measures to prevent risk to others while they are receiving that benefit. If Moore Pontiac had followed its policy, the insurance company would have no basis to deny a claim related to the policy. While the presence or absence of insurance is not a factor in determining damages, as a matter of law it can be considered to determine the nature of the duty Moore Pontiac assumed and the reason for assuming the duty.

Assumption of a duty is meaningless if there is no one to whom the duty is owed. The general public is clearly the beneficiary of such a duty whether each member of the public is aware of the duty or not. For example, each member of the public may not be aware of a company's duty not to release hazardous waste where they may come in contact with it, but the company still has the duty and the public is the beneficiary. In the same way, Moore Pontiac

38

had the duty not to allow an unsafe test driver loose on the public without reasonable efforts to be safe.

What is most troubling to me in this case is that there are questions of fact for the jury to determine that are ignored if Moore Pontiac is given a directed verdict, tempting though that might be if we were the finders of fact. That is not what an appellate court should do. There is simply too much evidence in the record to say that as a matter of law Moore Pontiac had no duty to Scott. If there is any evidence which the jury might believe to support its findings of fact, then we must give deference to its decision. Here, the jury determined the facts to be against Moore Pontiac. Moore Pontiac was properly submitted to the jury as a party in this case because it undertook a duty for the benefit of itself, its customers, and the public. The jury having made its decision after weighing the evidence, I would affirm its verdict against Moore Pontiac and Morgan, and its apportionment of fault between them.

COUNSEL FOR APPELLANT TIMOTHY MORGAN:

Pamela Adams Chesnut
Boehl, Stopher & Graves, LLP
444 West Second Street
Lexington, Kentucky 40507-1040


COUNSEL FOR APPELLANT MOORE PONTIAC, BUICK, GMC, INC.:

Deborah H. Patterson
Rania Marie Basha
Virginia Hamilton Snell
Wyatt, Tarrant & Combs
500 West Jefferson Street, Suite 2800
Louisville, Kentucky 40202

William J. Baird, III
William Jesse Baird, IV
Baird & Baird, P.S.C.
P. O. Box 351
Pikeville, Kentucky 41502


COUNSEL FOR APPELLEES CANDRIA SCOTT AND JAMES E. SCOTT, JR.:

Gary C. Johnson
Rhonda J. Blackburn
Gary C. Johnson, PSC
110 Caroline Avenue
P. O. Box 231
Pikeville, Kentucky 41502